## In re the GREAT AMERICAN PYRAMID JOINT VENTURE, Island Management Authority, Inc., H.R.C. (Memphis), Inc. aka Hard Rock Cafe International (Memphis), Inc., Pyramid Sponsorship Joint Venture, Pyramid Operating Authority, Inc. aka Pyramid Arena Design Authority, Inc., and Pyramid Management Authority, Inc., Debtors. (Jointly Administered Estates).

Bankruptcy Nos. 91–27955–D (rs) to 91–27960–D (rs).

United States Bankruptcy Court, W.D. Tennessee, W.D.

Aug. 19, 1992.

---

Harris P. Quinn, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., for City of Memphis, Tenn. and County of Shelby, Tenn.

William C. Gosnell, Memphis, Tenn., for debtors.

Bruce S. Kramer, Borod & Kramer, Memphis, Tenn., for Sidney L. Shlenker.

J. Robert Walker, William Young, Asst. Attys. Gen., State of Tenn., Nashville, Tenn., for Memphis State University.

William Jeter, Memphis, Tenn., for John Tigrett.

John Ryder, Memphis, Tenn.

Julie Chinn, Memphis, Tenn., Asst. U.S. Trustee.

Louis Lucas, Germantown, Tenn.

Monice Hagler, Memphis, Tenn., City Atty.

Mr. Brian Kuhn, Memphis, Tenn., for County.

David Blaylock, Memphis, Tenn.

Richard T. Doughtie III, Memphis, Tenn.

## ORDER RE "SUA SPONTE ORDER TO SHOW CAUSE [CASE DISMISSAL OR CONVERSION TO CHAPTER 7] …" COMBINED WITH RELATED ORDERS AND NOTICES

BERNICE BOUIE DONALD,
Bankruptcy Judge.

The instant proceedings [1] arise out of this Court's earlier Sua Sponte Order and Notice, pursuant to 11 U.S.C. §§ 1112(b) and 105(a), for the above-named debtors to appear and show cause why the above-entitled chapter 11 cases should not be dismissed or converted to the liquidating provisions of chapter 7 of the Bankruptcy Code.[2]

After careful consideration of the entire case record as a whole and statements of counsel and other parties in interest, the Court renders the following findings of fact and conclusions of law in accordance with F.R.B.P. 7052.

---

1. By virtue of 28 U.S.C. § 157(b)(2)(A), these are core proceedings.

2. In accordance with the prior Sua Sponte Order, creditors and other parties in interest could file separate, independent motions seeking a conversion or case dismissal. The City of Memphis; Shelby County, Tennessee; and the United States trustee timely filed such motions, which motions will be considered along with the Court's sua sponte action.

## BACKGROUND

The relevant background facts for purposes of the instant section 1112(b) proceedings may be stated as follows: Prior proceedings within these cases indicate that the Memphis Pyramid concept arose following an investigation by prominent Memphis citizens through a Sports Authority Commission ("SAC") into the need for a downtown sports arena. Mr. John Tigrett ("Mr. Tigrett"), who was a member of SAC, took the concept of a pyramid-shaped facility on the South bluff in downtown Memphis to the City of Memphis and Shelby County Mayors. The proposal was submitted to the Mayors of both the City and County in September, 1986. This proposal included an arena enclosed in a pyramid structure with an observation deck at the top. The concept was later amended to include museum and restaurant facilities within the pyramid structure as well.

Mr. Tigrett led a group of businessmen who agreed to supply the $300,000.00 needed to obtain a bonded, fixed-price quote from the construction contracting firm, on a fixed-cost, design-build contract for a pyramid-shaped multi-purpose arena which included the arena and leased space within the arena building (the "Pyramid").

By November, 1987, based on local community support, a Public Building Authority ("PBA") was formed to investigate the feasibility of constructing such a facility in the downtown area and ultimately to proceed with development of such facility. The PBA issued a report to the Memphis City Council and Shelby County Commission dated February 1, 1988. As authorized by these respective local legislative bodies, the Pyramid project ("Pyramid") was to be developed by the PBA as owner and leased back to the City and County for operation. Construction was to proceed under a negotiated design-build contract with the contractor which would be responsible for the detailed design as well as the construction of the Pyramid. With funds from the City, County, and State of Tennessee, PBA built the Pyramid under a fixed-cost, design-build contract.

The PBA, through a lease agreement ("Hard Rock Lease"), committed to leasing certain portions of the Pyramid (the "leased premises") to Hard Rock Cafe International (Memphis), Inc. ("Hard Rock Memphis") for the development of the observation deck, museum, and restaurant portions of the Pyramid.

Hard Rock Memphis was a wholly-owned subsidiary of Hard Rock Cafe International (Del.), Inc. ("Hard Rock International"). Hard Rock International was subsequently purchased by an English company. Thereafter, in early September, 1988, Hard Rock International disclaimed any intent to be involved with Hard Rock Memphis and the Lease Agreement. This left Hard Rock Memphis without the support of the parent company. Without the parent company supplying the franchise to operate a Hard Rock Cafe in the Pyramid, Hard Rock Memphis had to, and did, purchase a Hard Rock Cafe franchise (the "Franchise Agreement") in order to perform its lease obligations which included the construction and operation of a Hard Rock Cafe.

Hard Rock Memphis assigned the Lease Agreement to Pyramid Operating Authority, Inc. ("POA"). POA, wholly owned by Mr. Sidney Shlenker ("Mr. Shlenker"), subleased a portion of the leased premises back to Hard Rock Memphis so that Hard Rock Memphis could operate the Hard Rock Cafe.

Under a Finance and Use Agreement, dated August 26, 1988, between the State of Tennessee and the City and County, the State agreed to contribute $7,000,000.00 toward the construction of the Pyramid in return for which Memphis State University ("MSU") would receive certain rights related to the facility. These rights included priority use by the MSU basketball team, exclusive control over 11 skyboxes during any event held in the arena ("MSU boxes"), use of ten other skyboxes during MSU athletic events ("non-MSU boxes"), control of non-food concessions during University events and other privileges. Under the agreement, MSU was to furnish and equip the MSU boxes, leaving the remaining boxes to be finished by the City and County.

The contractor was given notice to proceed with construction in September, 1988. Later that year, the City and County requested proposals from various companies regarding management of the arena portion of the Pyramid. PMA was selected from among several proposals received from this solicitation and negotiations were commenced to reach an agreement.[3]

These negotiations resulted in a management agreement (the "Management Agreement") dated April 14, 1989, wherein the City and County contracted with PMA to manage, operate, promote and market the Pyramid on their behalf. The Management Agreement became effective immediately upon execution and was to expire five years after opening of the Pyramid. The Management Agreement requires PMA to manage and operate what commonly has been referred to as the arena portion of the Pyramid. PMA was to manage and operate the arena as a first class facility with integrity and in good faith.

During this period, Mr. Shlenker acquired the stock of POA from Mr. Tigrett. Since PMA had not yet been formed, POA entered into a Memorandum of Understanding with the City and County for the management contract for the arena. Under the Memorandum of Understanding, POA had the right to transfer its rights thereunder to another corporation controlled by Mr. Shlenker. POA designated PMA to enter into the Management Agreement. On April 14, 1989, a Management Agreement was executed by PMA, the City and County. PMA, at this time, was owned by Messrs. Shlenker and Tigrett.

As manager of the arena, PMA had certain specific duties under the Management Agreement. In their April 16, 1991 letter, the City and County declared PMA in default regarding certain provisions of the Agreement. The basic arrangement under the Agreement was that PMA would pay the City and County an annual fee in return for giving PMA expansive independent business control over the operation of the Pyramid including payment of operating expenses and retention of operating revenues. PMA also was responsible for managing the interests of the City and County in all skyboxes available for lease by the City and County under the terms of the Finance and Use Agreement. PMA was to assume responsibility for providing certain equipment and furnishings in the Pyramid which would otherwise have been the responsibility of the City and County including athletic flooring, goals, score tables, team benches, scoreboards, video display boards, telephone system equipment and wiring, in addition to locker room, concession, first-aid, janitorial, maintenance, and other equipment. The management authority given PMA under this agreement was subject to the terms and conditions of the Finance and Use Agreement between the City and County and the State.

A major element of the Management Agreement was the establishment by PMA of a reserve fund in cash, letter of credit or equivalent in the amount of $3,000,000.00 to be held in escrow by a mutually acceptable escrow agent for the benefit of the City and County. The purpose of the fund was to provide the City and County with security in the event PMA failed to pay fees to the City and County otherwise owing under the Management Agreement. In a separate escrow agreement ("Escrow Agreement") executed on July 14, 1989, among PMA, the City, County, and Union Planters National Bank ("Union Planters"), the parties agreed that Union Planters would act as escrow agent and that the reserve fund could be funded, at PMA's option, in several ways. In the event marketable securities were placed in escrow, the securities were required to have a val-

---

**3.** The City and County sought a manager for the arena portion of the Pyramid. Mr. Shlenker was introduced to Mr. Tigrett and then to City and County. City and County received several bids, including one from Mr. Shlenker, for the arena management contract. Under Mr. Shlenker's original proposal, the manager would receive an annual fee and a percentage of the revenues. Prior to the City and County selecting Mr. Shlenker as their manager, he submitted an alternative proposal which provided that City and County would be paid a guaranteed annual amount by the management company. The initial annual payment was to be $3,000,000.00.

ue of at least 110% of the required reserve fund amount of $3,000,000.00. It was agreed by those parties that the initial escrow deposit would be in the form of certain stock certificates having a value at that time of $3,981,267.00. Under the escrow agreement, Union Planters was to monitor the value of stock weekly and notify the City, County, and PMA should the value of the stock fall below $3,300,000.00 or 110% of the required reserve fund, in which event PMA had an obligation to replace the deficiency.

A short time before the execution of the City and County Agreement, Hard Rock Memphis' interest in the leased premises was conveyed to POA with the consent of the City and County, by virtue of an Assignment, dated March 28, 1989. Even though the ownership of each company differs somewhat, POA and PMA have an identical management structure; Mr. Shlenker, as President and Chief Executor Officer, Mr. Marshall Criss ("Mr. Criss") as Chief Administrative Officer, and Mr. Walter Richards as Chief Financial Officer. POA and PMA, and the other related entities, are often referred to collectively as "the Pyramid Companies".

Soon after execution of the Management Agreement, PMA contacted MSU about managing MSU's interests in the Pyramid. An agreement was executed among others, PMA and MSU, and was effective August 3, 1990 (the "MSU Agreement"). In return for an annual fixed payment from PMA, this agreement extended PMA's operational control at the Pyramid to include the management of MSU's interests for a five-year term with operations to renew for additional terms.

A major element in the MSU Agreement centered on the skyboxes. Under this agreement, PMA assumed responsibility for furnishing the 11 skyboxes which MSU had the responsibility to furnish under the Finance and Use Agreement. PMA was given the right to retain all revenues from the rental of skyboxes in which MSU had an interest, in effect giving PMA control over most of the skyboxes.

Pursuant to this agreement, MSU would also make available, $2,200,000.00 to PMA for certain capital improvements at the Pyramid, including the furnishing of skyboxes, athletic flooring, scoreboards, video screens, and similar fixtures and equipment. In the event of a default by PMA and termination of the agreement, PMA agreed to pay MSU the sum of $158,000.00 per year up to the amount of any disbursements by MSU of the $2,200,000.00. This obligation by PMA was to be secured during the initial five year period by the proceeds from the rental of the non-MSU skyboxes for that period. Additional security was to be provided by PMA for disbursements by MSU exceeding $790,000.00. In effect, PMA was only entitled to $790,000.00 of the $2,200,000.00 from MSU without providing additional security, such as the pledge of non-MSU skybox rentals for additional five year periods or as otherwise acceptable to Board of Regents and MSU.

Provisions were also included in the MSU Agreement that related to the rights of the parties regarding the sale of advertising, private club memberships, non-food concessions, parking, public broadcast fees, and other operational items. Finally, pursuant to relevant terms of the agreement the agreement shall terminate, effective immediately thereupon, if and when the PMA Agreement should *effectively terminate.*

Even though PMA pledged the revenues from non-MSU skyboxes to secure the repayment of at least $790,000.00 in capital disbursements by MSU in the event of PMA's default, PMA had already pledged these skybox revenues to National Bank of Commerce as security for a loan several months prior to the execution of the MSU Agreement. During this period, PMA apparently entered into several skybox leases, receiving payments therefrom, giving the leaseholder the right to use a box during all public events including MSU events, prior to being giving authority to do so for MSU events by the MSU Agreement. Mr. Criss testified that PMA took these actions with MSU's knowledge and consent. Mr. John Cothern, the principal negotiator on behalf of MSU, testified however, that he

was unaware of either circumstance during the negotiations with PMA.

There was difficulty throughout the construction of the Pyramid in coordinating the planned activities of POA and PMA in the Pyramid with the construction schedule of the contractor. Since these firms were to be the principal users of the facility, the most efficient procedure, it was said, would have been to have the design elements required for their use in place as each stage of construction progressed. For example, the needs of POA and PMA would impact the design of food concession areas; the stage "rigging grid"; the foundations and trusses supporting the inclinator ride to the observation deck; the heating, ventilating, and air conditioning ("HVAC") system; the electrical system; the computer management system to monitor the HVAC and electrical systems; and the skybox finishes. Construction progress reports issued by Mr. Bennett from August 1989 through April 1991 are replete with references to items requiring action or decisions by PMA or POA.

In early 1991, the City and County officials became concerned that PMA would not be in a position to open the Pyramid for events in a timely fashion after construction of the structure was completed. The opening of the Pyramid had initially been planned for either late spring or early summer, 1991; but by May 1991, the projected opening date had been extended to November, 1991.

A major concern was whether PMA could provide the furnishings and equipment necessary to have the arena available for the opening of the MSU basketball season in November, 1991. Timing was critical insofar as season ticket sales and related activities had to be planned and undertaken by MSU several months in advance of the opening of the season.

Under the Management Agreement, PMA was to, inter alia, install a wide variety of furniture, fixtures, and equipment in the playing area, concession areas, skyboxes, and dressing rooms required for the Pyramid to host basketball events. In a letter to the City and County dated May 16, 1991, PMA estimated the total cost of the items necessary to open and operate the arena in a first class manner to be $8,428,-491.00. Among the funding sources cited in this letter was $1,965,063.00 from MSU; however, PMA admittedly had never provided MSU with the additional security required to draw more than $790,000.00 from MSU for such improvements. PMA's letter stated that it would be necessary for the City and County to promptly approve using certain skybox rentals as security to MSU in order to secure the balance of the MSU $2,200,000.00.

PMA's May 16, 1991 letter also cites PMA as the source of $4,563,428.00 or more than half of the total outlay required to have the arena open by the Fall. PMA repeatedly asserted that the financing required to provide such an amount was imminent. On one occasion, PMA displayed a letter to the City and County officials purportedly committing $80,000,000.00 to the project, based on a permanent loan commitment; however, the debtors were subsequently unable to get a construction loan commitment. As a result, construction funds and operating capital came from Mr. Shlenker, Mr. Tigrett, sponsors, concessionaires, and loans.

Another major source of concern to City and County officials during this period was maintenance of the required reserve fund in escrow by PMA. In September 1990 the parties to the escrow agreement executed an amendment whereby certain corporate stock held in escrow by Union Planters was giving a fixed value for purposes of determining the escrow amount for a fixed valuation period. Under the amendment, it was agreed that PMA would replace these shares prior to the termination of the fixed valuation period with cash, letter of credit, or other securities of a type which could be valued more easily. A second amendment dated January 10, 1991, was executed whereby PMA was allowed to reduce the shares of the stock in question held by Union Planters. The fixed value of the remaining shares in the escrow was increased, and the fixed valuation date was extended until April 1, 1991. The City and

County agreed to release part of the stock in order to give PMA some much-needed operating capital.

By mid-February 1991, officials of the City and County were aware that there was dissension among the principals of PMA. In March 1991, the City and County were concerned enough about the entire situation to prepare a list of existing defaults/anticipated defaults by the Pyramid companies, which representatives of the City and County discussed personally with the two principals.

A meeting was held among the City, County, and the Pyramid Companies on April 12, 1991, at which time the Pyramid Companies presented information relative to the status of the project. Over the next several days, City and County officials studied the information provided by the Pyramid Companies at that meeting. Since the Pyramid Companies had not obtained financing and were not meeting dates on their own schedules, the City and County reached a decision that further action would be required to get the Pyramid open on a timely basis.

By letters dated April 16, 1991, the City and County issued two separate default notices to PMA relating to PMA's asserted failure to perform under its management agreement with the City and County, and to management obligations and escrow requirements. It is observed that litigation is currently pending in the State court regarding the escrow release and other matters involving rights and obligations under the Escrow Agreement. One notice declared PMA to be in default of seven sections of the Agreement dealing with a variety of responsibilities required of PMA, including the provision of the furniture, fixtures, and equipment necessary to make the Pyramid arena functional for public events. A separate notice stated that PMA had previously been notified by Union Planters that the fixed valuation period under the Escrow Agreement had expired without replacement of the corporate stock in question and that there was a deficit in the escrow of $2,771,047.12 in marketable securities or $2,519,113.75 in cash or equiv-

alents. The notice further declared PMA's failure to correct this deficiency to be an event of default under the Management Agreement. Both notices made references to the thirty (30) day cure period provided in the Management Agreement.

PMA and the City and County thereafter met on numerous occasions relative to these default notices. During these meetings, PMA officials allegedly acknowledged the existence of defaults, but represented that financing was imminent and maintained that they were attempting to cure the defaults. The 30–day deadline was extended by the City and County on several occasions to give PMA time to deliver on promised actions.

PMA did not cure the defaults contained in the prior notices. By letter to PMA dated June 17, 1991, the City and County informed PMA that the management agreement with PMA was being terminated by the City and County as of that date. A copy of this letter was subsequently sent to MSU. Based upon the City and County's action, MSU sent a letter dated June 26, 1991, to PMA stating that the MSU Agreement had terminated effective June 17, 1991, citing the automatic termination provision of the Agreement.

The City and County thereafter proceeded to make arrangements for the completion of the Pyramid arena by November, 1991. The City and County and MSU negotiated an agreement whereby MSU would contribute $3,000,000.00 to be used for improvements required in the Pyramid arena for it to open. MSU received additional consideration, such as a share of the concession revenues from the City and County, in return for this additional capital contribution. The City and County either assumed or renegotiated the sponsorship agreements with the sponsors who were then in place as a result of debtors' efforts. Under certain of the renegotiated agreements, some of the sponsors provided funding to complete the concession areas.

 On July 23, 1991, the six above-named debtors filed original petitions under chapter 11 of the Bankruptcy Code. The mere filing of the chapter 11 petitions

triggered the automatic stay provisions of section 362(a) by operation of law. It is specifically noted that the automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from creditors. It stops collection efforts, all harassment, and all foreclosure and repossession actions. It permits the debtor to attempt to formulate a reorganization plan. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963.

## DISCUSSION

■ The ultimate goal of a business reorganization under chapter 11 of the Bankruptcy Code is the judicial confirmation of a reorganization plan that enables the debtor to restructure its pre-bankruptcy debts, pay its creditors, and return to active operation as a viable enterprise, free from judicial control and creditor scrutiny. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977) 1978 U.S.Code Cong. & Admin.News p. 6179; *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984); *In re Mold Makers, Inc.*, 124 B.R. 766, 767 (Bankr.N.D.Ill. 1990); *In re J.M. Fields, Inc.*, 26 B.R. 852, 857 (Bankr.S.D.N.Y.1983).

Thus, it has been said that the American bankruptcy laws have been designed to give a failing business a breathing spell while it attempts to work out its financial problems. *U.S. v. Whiting Pools, Inc.*, infra. An important benefit which the troubled business receives, ipso facto, upon the filing of the chapter 11 petition is the aforesaid stay of debt collection and lien enforcement pursuant to section 362(a). Generally speaking, prepetition obligations are frozen by this protective shield which ordinarily permits the debtor to concentrate its resources on reorganizing and attempting to nurse the business back to health. 11 U.S.C. §§ 362(a) and 1121. See also, e.g., *In re Equity Funding Corp. of America*, 396 F.Supp. 1266 (C.D.Cal.1975). It is ex-

pressly observed that statutory protections and safeguards exist for creditors and other parties in interest while the debtor attempts to reorganize under the provisions of chapter 11. See, among others, 11 U.S.C. §§ 363(c)(2) and (e), 1111(b)(2), and 1129(b)(2)(A) and (B).

■ The Bankruptcy Code has a built-in bias favoring reorganization over liquidation.[4] As the United States Supreme Court has said:

> "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

That is, the underlying purpose behind chapter 11 is "to permit successful rehabilitation of debtors" and "to prevent a debtor from going into liquidation". *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Specific provisions of the Bankruptcy Code should ordinarily be interpreted with this goal in mind. *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir.1984).

In *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983), the Supreme Court said:

> "By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners.... Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if sold for scrap."

It has been said that bankruptcy is a distinct system of jurisprudence. Article I, Section 8, Clause 4, of the United States Constitution provides that Congress may pass uniform laws on the subject of bankruptcies, which Congress has done as evidenced by the Bankruptcy Reform Act of

---

**4.** Chapter 11 of the Code permits "liquidating plans". 11 U.S.C. § 1123(b)(4). Cf. *In re Pure Penn Petroleum Co., Inc.*, 188 F.2d 851 (2nd Cir.1951) (decided under the former Bankruptcy

Act of 1898, as amended). Further compare the statutory "liquidating plan" (i.e. scheme of distribution) in chapter 7 cases set forth in 11 U.S.C. § 726.

1978. Pub.L. No. 95–598, 92 Stat. 2549 (1978), as amended, and codified, in relevant part here, at 11 U.S.C. §§ 101–1174. The nature of bankruptcy is to essentially sort out all of the debtor's legal relationships with others, and to apply the principles and rules of the bankruptcy laws to those relationships, with the goal of either financially rehabilitating a distressed debtor or assembling and liquidating the debtor's assets for distribution to creditors. Rehabilitation of a chapter 11 debtor sometimes requires modification of the pre-bankruptcy debtor-creditor relationships. See, e.g., 11 U.S.C. § 1123(b)(1). A claim in bankruptcy may be satisfied in a manner quite different from that which was originally contemplated by the parties, subject to certain statutory protections and safeguards. See, e.g., 11 U.S.C. § 1129(b)(2)(A) and (B). Public interest and other social and economic concerns are injected into bankruptcy as evidenced in the portion of the bankruptcy statutes that seek to rehabilitate, rather than to liquidate. 11 U.S.C. §§ 1101–1174.

■ Not surprisingly, all troubled businesses cannot be rehabilitated or successfully reorganized under chapter 11, which chapter is clearly not a panacea for all problems. Cf. 11 U.S.C. § 1112(b). The section 362(a) automatic stay and the accompanying breathing spell do not last forever. See section 362(c) and (d). Every case should move to a conclusion at the earliest time and with the least expense which are consistent with the interest of justice. Moreover, F.R.B.P. 1001 provides that "[t]hese rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding".

In the instant chapter 11 cases, the section 362(a) stay was consensually modified to allow the Leisure Management, Inc. to operate the Pyramid arena without prejudice to the debtors' rights during the pendency and awaiting the outcome of motions filed on September 20, 1991 by certain of the debtors pursuant to section 365 of the Bankruptcy Code seeking to assume, inter alia, the contracts and/or leases (Pyramid Management Agreement, Hard Rock Lease, and MSU Agreement) in question. These three motions (and others) were combined for hearing since the contracts sought to be assumed related to, e.g., the debtors' prepetition activities at the Pyramid arena. By order of this Court, entered on October 1, 1991, the hearing on these motions was bifurcated to allow for the consideration of the prepetition purported termination of the respective contracts as a threshold issue. The proof respecting this issue commenced on January 22, 1992. The hearings were protracted. Ultimately, the Court found, inter alia, in favor of the City and County regarding the POA contract and in favor of the debtor regarding the PMA contract. The balance of PMA's section 365 motion is pending at this time, awaiting a trial date on the merits.

## QUESTIONS PRESENTED

Query, what is a reasonable breathing spell and fair opportunity for a chapter 11 debtor to seek to rehabilitate before pulling the reorganization plug? The ultimate questions for judicial determination here, considering the realities of these case administrations at this time, is whether reorganization is now visionary only or hopeless and whether liquidation or dismissal is the only appropriate solution under the existing circumstances?

## CONCLUSIONS

■ Pursuant to the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554 (1986), a bankruptcy judge may, under section 105(a), as amended, convert or dismiss a case sua sponte even though section 1112(b) explicitly requires that the request be made by a party in interest. Cf., e.g., *In re Moog*, 46 B.R. 466 (D.C.Ga.1985); *In re Ray*, 46 B.R. 424 (D.C.Ga.1984). In the instant cases the court initially acted sua sponte pursuant to 11 U.S.C. §§ 1112(b) and 105(a) and *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 373–74 (5th Cir.1987), affirmed 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), holding, inter alia, that despite the changes

brought on by the Bankruptcy Reform Act of 1978, a bankruptcy judge still has the responsibility and inherent duty and power to control its dockets to see to the efficient and effective administration of the bankruptcy system and to ensure that legislation administered by the court accomplishes its legislative purpose. See also F.R.B.P. 1001. Cf. the Civil Justice Reform Act of 1990. As noted in footnote 2, supra, the United States trustee, the City of Memphis, and Shelby County, Tennessee subsequently filed section 1112(b) motions.

■ Section 1112 of the Bankruptcy Code brings together all of the dismissal and conversion rules for chapter 11 cases.[5] Subsection (b) gives the court broad discretion to make an appropriate disposition of the chapter 11 case. For "cause", the court is statutorily authorized to convert a chapter 11 case to a chapter 7 liquidation case or to dismiss the case, whichever is in the best interest of creditors and the estate. What constitutes "cause" for a conversion or dismissal of a chapter 11 case under section 1112(b) is subject to judicial discretion under the particular circumstances of each case. See, e.g., *In re Winslow*, 123 B.R. 641 (D.Colo.1991).

Specifically, section 1112(b) sets forth ten non-exhaustive illustrations or grounds of "cause". The relevant statutory grounds here are contained in subsection (b)(1) through (3) which provide in relevant part as follows:

"[A]fter notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause including—

"(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

"(2) inability to effectuate a plan;

"(3) unreasonable delay by the debtor that is prejudicial to creditors;"

■ It is important to observe that "cause" for conversion or dismissal is not limited to the circumstances described in paragraphs (1) through (10) of section 1112(b) since, by virtue of section 101(3) of the Code, the use of the word "including" in section 1112(b) does not limit "cause" to the enumerated statutory grounds. Since the section 1112(b) statutory list is not exhaustive, the court is able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), 1978 U.S.Code Cong. & Admin.News pp. 6361–62. For example, a debtor's failure to file the required monthly reports with the court may constitute "cause" to dismiss or convert a chapter 11 case. *In re Bacon*, 52 B.R. 52 (Bankr.N.D.Iowa 1985). Here, the debtors had not timely filed the monthly operating reports at the time of the issuance of this Order to Show Cause, but such reports were filed prior to this sua sponte hearing. Likewise, the 28 U.S.C. § 1930(a)(6) quarterly United States trustee's fees were not current at the time of the issuance of the Order to Show Cause, but were paid prior to this sua sponte hearing.

■ Addressing the relevant statutory grounds, it is noted that under section 1112(b)(1), the debtor's financial condition must be such as to permit the court to determine that there is no reasonable likelihood that the debtor will be rehabilitated. "Rehabilitate" has been known to mean "to put back in good condition; re-establish a firm, sound basis". *Webster's New World Dictionary 1225* (World 1964). Rehabilitation, as used in section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in chapter 11. *In re Alves Photo Service, Inc.*, 6 B.R. 690 (Bankr.D.Mass.1980). In determining whether the grounds for conversion or dismissal set forth in section 1112(b)(1) are satisfied, the court, according to *5 Collier On Bankruptcy*, ¶ 1112.03, p. 1112–19 (15th ed.), must determine whether the causes of the debtors' continuing losses can be corrected. While a debtor should have a

---

**5.** Subsection (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a chapter 7 liquidation case.

fair opportunity to reorganize, such opportunity must be balanced against protection of creditors' interest. Understandably, competing and countervailing interests must be considered and balanced. When visionary schemes for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order. Cf. *Tennessee Publishing Co. v. American National Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936).

Under the statutory ground contained in section 1112(b)(2), the court may dismiss or convert a chapter 11 case if the court determines that it is unreasonable to expect that a plan can be confirmed in the chapter 11 case. Under the statutory ground contained in section 1112(b)(3), the court may dismiss or convert a chapter 11 case based upon the "unreasonable delay by the debtor that is prejudicial to creditors". The "unreasonable delay" standard in section 1112(b)(3) must be read in conjunction with section 1112(b)(2) which merits dismissal or conversion based upon inability to effectuate a plan and section 1112(b)(4) which permits conversion or dismissal based upon the failure to propose a plan.

When ruling on a section 1112(b) motion, a court must, as a threshold matter, determine whether such "cause" exists. See, e.g., *In re Gonic Realty Trust*, 909 F.2d 624, 2626 (1st Cir. 1990); *In re T.S.P. Indus., Inc.*, 117 B.R. 375, 376 (Bankr.N.D.Ill.1990). That is, once cause is ascertained, section 1112(b) requires a court to move to a second, analytically separate step and to base its decision whether to dismiss or convert on "the best interest of creditors and the estate". Once the threshold is passed and cause is found to exist, the decision whether to convert to chapter 7 or to dismiss is committed to the discretion of the bankruptcy court. See, e.g., *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989); *In re T.S.P. Indus., Inc.*, 117 B.R. at 376. The choice of conversion or dismissal under section 1112(b) must be based on a "best interest of credi-

tors and the estate" test. See, e.g., *In re T.S.P. Indus., Inc.*, 117 B.R. at 376.

In the instant cases the fact that the above-named debtors' business operations, except for the above-named debtor, Pyramid Management Authority, Inc. ("PMA"), have essentially ceased, provides under a totality of the circumstances, reasonable grounds for "cause" under section 1112(b)(1)—that is, "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation" constitute cause under section 1112(b). See, e.g., *In re Gonic Realty Trust*, 909 F.2d at 627. It is not anticipated that these five debtors' problems can now be corrected. That is, there is no reasonable probability that these five debtors can successfully rehabilitate. As noted earlier, the purposes of the laws of Congress relating to bankruptcy are to encourage financial restructuring and to encourage payments to creditors; however, when no or substantially no business is left to reorganize, chapter 11 cases do not serve those purposes, and "cause" exists. Cf. *In re Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985). As also noted earlier, the debtors' privilege to seek to reorganize must be balanced against protection of creditors' competing and countervailing interest on a case-by-case basis. There is no constitutional right to obtain a discharge of one's debts in bankruptcy. *United States v. Kras (In re Kras)*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973); *In re Krohn*, 886 F.2d 123 (6th Cir.1989). Moreover, a bankruptcy discharge is a privilege. *In re Tabibian*, 289 F.2d 793, 795 (2nd Cir.1961).

Evidence that the chapter 11 debtor had not been able to present a confirmable reorganization plan in 14 months and that the debtor's principal asset, an office building, had been removed from the estate through a foreclosure sale was sufficient to support the bankruptcy court's finding of "cause" to convert the case to chapter 7 in the case of *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723 (5th Cir.1991). See also, e.g., *Hall v. Vance*, 887 F.2d 1041 (10th Cir.1989). Cf., e.g., the POA case herein. Although the bankruptcy court should not

precipitously sound the death knell for a chapter 11 debtor by prematurely converting or dismissing the case, if a confirmable reorganization plan has not been submitted within a reasonable time, the case should be dismissed or converted to chapter 7. See, e.g., *In re BGNX, Inc.*, 76 B.R. 851 (Bankr.S.D.Fla.1987); *In re Tracey Service Co., Inc.*, 17 B.R. 405 (Bankr.E.D.Pa.1982). A debtor's lack of assets necessary to operate the business is a factor to consider under section 1112(b) litigation. Cf. *In re Steak Loft of Oakdale, Inc.*, 10 B.R. 182 (Bankr.E.D.N.Y.1981). Absence of reasonable likelihood of rehabilitation is also a factor to consider under section 1112(b) litigation. Cf. *In re L.S. Good & Co.*, 8 B.R. 310 (Bankr.W.Va.1980).

■ In the instant cases the above-named five debtors, The Great American Pyramid Joint Venture, Island Management Authority, Inc., H.R.S. (Memphis), Inc., aka Hard Rock Cafe International (Memphis), Inc., Pyramid Sponsorship Joint Venture, and Pyramid Operating Authority, Inc., aka Pyramid Arena Design Authority, Inc., have failed to demonstrate a reasonable likelihood of successful reorganization. Such delays are unduly prejudicial and unreasonable considering a totality of the particular facts and circumstances. Simply and bluntly stated, these five debtors have ceased to be viable businesses and should be converted to the liquidating provisions of chapter 7 or dismissed. The prospect of successful reorganizations of these debtors is so unpromising the court cannot be warranted in permitting the cases to proceed to confirmation hearings with attendant costs and unfair delays. Cf. *In re Alexander*, 48 B.R. 110 (Bankr.W.D.Mo.1985). A reorganization plan under chapter 11 must be more than a nebulous speculative venture and must have a realistic chance of success which would lead to rehabilitation, and if outside financing is needed, it must be *clearly* in sight. *In re K.C. Marsh Co., Inc.*, 12 B.R. 401 (Bankr.D.Mass.1981). The Bankruptcy Code does not guarantee successful reorganization, nor does it provide a framework within which the debtor may indefinitely operate; rather, it only provides a breath-

ing period for the debtor to seek to reorganize. *In re Jones*, 115 B.R. 351 (Bankr. N.D.Fla.1990). In light of the case records here, these five debtors must realize, based on the realities of the circumstances, that reorganization is not possible and that dismissal or liquidation under chapter 7 is the only feasible alternative. It is time to pull the chapter 11 reorganization plug for these five debtors to allow the liquidation process under the provisions of chapter 7 to commence or for case dismissals. The Court does not at this time find such cause in the case of PMA, which may go forward with the hearing under section 365 in order to have its day in court regarding the assumption question. A final pretrial conference will be scheduled for September 11, 1992, at 9:00 a.m. concerning the PMA lease assumption issue. It is expressly emphasized here that the case administration of PMA will be placed on a "fast track". PMA is hereby directed to file a disclosure statement and plan within 30 days from the entry of this Order.

This result is also compatible with equitable principles as well. The five chapter 11 cases are no longer in an embryonic stage. The five debtors have been given a reasonable opportunity to conclude these chapter 11 cases without delay. The Court is satisfied that the five above-named debtors have been given a reasonable opportunity to achieve rehabilitation, but they have been unable to do so. PMA, however, should now be given an opportunity to be heard under section 365 since it prevailed on the threshold issue.

■ Nonetheless and as a threshold matter, the Court finds, considering a totality of the particular facts and circumstances and applicable law, sufficient "cause" exists in the five above-named cases to warrant a conversion to the liquidating provisions of chapter 7 or a case dismissal. Now that the threshold is passed and cause has been found to exist, the next matter is the choice of conversion from chapter 7 to chapter 11 or dismissal under section 1112(b) for these five debtors.

In weighing the considerations for a conversion from chapter 11 to chapter 7 or a case dismissal, the court should consider a totality of all the facts and circumstances based on "the best interest of creditors and the estate" test. The court should consider, inter alia, the positions of parties in interest since their determination must be dictated by the best interests of creditors and the estate. By virtue of section 307, the United States trustee may appear and be heard as may other parties in interest by virtue of section 1109(b).

■ Having considered and weighed a totality of the facts and circumstances as applied to "the best interest of creditors and the estate", the Court finds that a conversion from chapter 11 to the liquidating provisions of chapter 7 in each of the five above-named cases is more preferable than a case dismissal. The Court should consider, inter alia, the position of the creditors' committee since its determination must be dictated by the best interests of creditors of the estate. See *In re International Swimming Pool, Corp.*, 186 F.Supp. 63 (S.D.N.Y.1960) (where the court gave weight to the position of the creditors' committee opposing a motion for indemnity). The United States trustee, among others, supports a conversion over a case dismissal. Specifically, the participating parties in interest voiced their preferences as follows:

| Name of Party In Interest | Supports Case Dismissal | Supports Conversion To Chapter 7 | Supports Debtors Remaining in Chapter 11 | No Position Taken |
|---|---|---|---|---|
| City of Memphis | X | | | |
| Shelby County | X | | | |
| Memphis State University | | X | | |
| Leisure Management | | | | X |
| John Tigrett | | | X | |
| Chairman of Unsecured Creditors Committee | | | X | |
| Individual Unsecured Creditors | | | | |
| Mr. Sammons | | X | | |
| Mr. Wharton | | X | | |
| Mr. McVean | | X | | |
| United States Trustee | | X | | |
| Debtors (6) | | | X | |
| Sidney Shlenker | | | X | |

The City and Shelby County alternatively support a conversion to chapter 7. The Chairman of the Creditors' Committee supports, inter alia, PMA remaining in Chapter 11.

Obviously, some assets are available for liquidation by a chapter 7 trustee; and chapter 7 contains a liquidating statutory plan. Accordingly, the chapter 11 cases of the five above-named debtors, The Great American Pyramid, Joint Venture, Case No. 91–27955–D (rs); Island Management Authority, Inc., Case No. 91–27956–D (rs); H.R.C. (Memphis), Inc. aka Hard Rock Cafe International (Memphis), Inc., Case No. 91–27957–D (rs); Pyramid Sponsorship Joint Venture, Case No. 27958–D (rs); and Pyramid Operating Authority, Inc., aka Pyramid Arena Design Authority, Inc., ("POA") Case No. 91–27959–D (rs), are hereby converted to the liquidating provisions of chapter 7 of the Bankruptcy Code. The United States trustee shall take the necessary steps to appoint an interim trustee in each converted case.

It is observed that chapter 7 of the Bankruptcy Code provides a statutory means for an orderly liquidation and equitable distribution of the debtors' assets. It is a form of relief afforded by the bankruptcy laws which involves the collection, liquidation, and distribution of the property of a debtor. Promptly after the order for relief under chapter 7,[6] the United States trustee shall appoint a disinterested person that is

6. See 11 U.S.C. § 348(a).

a member of the panel of private trustees established under 28 U.S.C. § 586(a)(1) to serve as interim trustee in the case.[7] The service of the interim chapter 7 trustee continues until the election or designation of a permanent case trustee pursuant to 11 U.S.C. § 702.[8]

It is further observed that 11 U.S.C. § 704 sets forth the essential statutory duties of a section 702 trustee. The chapter 7 trustee's principal statutory duty is to collect and reduce to money the property of the estate for which the trustee serves and to close the estate as expeditiously as is compatible with the best interests of creditors and other parties in interest. The chapter 7 trustee must be accountable for all property received, and must investigate the financial affairs of the debtor. If a purpose would be served (such as if there are assets that will be distributed), the chapter 7 trustee is required to examine proofs of claim and object to the allowance of any claim that is improper. The trustee is also responsible to furnish such information concerning the estate and its administration as is required by a party in interest.

Once the chapter 7 trustee has abandoned burdensome properties and collected and reduced to money the other properties of the estate for which the trustee serves,[9] section 726 then dictates the order in which distribution is made to creditors. That is, chapter 7 contains a statutory "liquidating plan". Cf. 11 U.S.C. § 1123(b)(4).

In *Burlingham v. Crouse*, 228 U.S. 459, 473, 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913), the Supreme Court stated that "the twofold purpose of the Bankruptcy Act [is] to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start...." For corporations and partnerships, who do not receive chapter 7 discharges,[10] the liquidation and equal distribution of assets among creditors is the primary purpose.[11]

The pending motions of the City, Shelby County, and the United States trustee are hereby disposed of in accordance and consistent with the foregoing.

Based on the foregoing and the case records as a whole,

IT IS ORDERED AND NOTICE IS HEREBY GIVEN THAT:

1. The chapter 11 cases of the following five above-named debtors are converted to cases under chapter 7: The Great American Pyramid Joint Venture, Case No. 91–27955–D (rs); Island Management Authority, Inc., Case No. 91–27956–D (rs); H.R.C. (Memphis), Inc. aka Hard Rock Cafe International (Memphis), Inc., Case No. 91–27957–D (rs); Pyramid Sponsorship Joint Venture, Case No. 91–27958–D (rs); and Pyramid Operating Authority, Inc. aka Pyramid Arena Design Authority, Inc., Case No. 91–27959–D (rs).

2. The five above-named debtors shall:

a. forthwith turn over to the chapter 7 trustee all records and property of the estate under their custody and control as required by F.R.B.P. 1019(4); and

b. within 30 days of the date of this order, file a final report of all receipts and distributions made, together with a schedule of all unpaid debts incurred after the commencement of the chapter 11 case, as required by F.R.B.P. 1019(5).

---

7. See 11 U.S.C. § 701(a)(1).

8. The interim chapter 7 trustee is considered a trustee under the Bankruptcy Code whose appointment is designed to protect the assets of the estate and insure continuity of administration of the estate before the qualification of the regularly elected or designated case trustee.

9. It is noted that section 365(d)(1) provides as follows:

"In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such contract or lease is deemed rejected."

10. See 11 U.S.C. § 727(a)(1). It is also noted that chapter 11 liquidating corporations and partnerships also do not receive discharges. 11 U.S.C. § 1141(d)(3)(A), (B), and (C).

11. Experience has demonstrated that chapter 7 liquidations are generally much less expensive and time consuming than liquidations under chapter 11.

3. The five above-named debtors within 15 days of the date of this order shall file the chapter 7 statements and schedules required by F.R.B.P. 1019(1)(A) and 1007(b) and this Order.

4. Pursuant to F.R.B.P. 2002(f)(2), the Bankruptcy Court Clerk shall give the debtors, all creditors, and other parties in interest, including the United States trustee, notice by mail of the conversions of these five cases to chapter 7; however, by virtue of F.R.B.P. 9007, the notice of conversions may be combined with the section 341(a) meeting of creditors notice to issue in the five above-named converted chapter 7 cases.

5. The above-named debtor, PMA, shall file and serve a disclosure statement and plan within 30 days from the entry of this Order. Failure to timely file the chapter 11 disclosure statement and plan may constitute cause to convert or dismiss the case.

6. A final pretrial conference shall be held on September 11, 1992, at 9:00 a.m. to consider PMA's section 365 motion.