In re SOUTHERN INTERNATIONAL COMPANY, L.P., Debtor.

Bankruptcy No. 90–33913–S.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

April 5, 1991.

David R. Ruby, McSweeney, Burtch & Crump, P.C., Richmond, Va., for debtor.

Stanley K. Joynes, III, LeClair, Ryan & Joynes, Richmond, Va., for creditors.

John E. Waites, Richmond, Va., U.S. Trustee.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes on the motion of the U.S. Trustee for conversion of this case to a case under Chapter 7 of the Bankruptcy Code. Joining in this motion is the Official Committee of Unsecured Creditors. After hearing and argument on April 2, 1991, the Court makes the following findings of fact and conclusion of law.

On December 7, 1990, an involuntary Chapter 7 petition was filed against the debtor. The debtor failed to respond to the involuntary petition and an order for relief under Chapter 7 was entered herein on January 3, 1991. The Court ordered the case converted to Chapter 11 upon the debtors filing of a motion on the same day.

The debtor acquired the company it now operates in November, 1989 and from that period through September 30, 1990, the statement of affairs filed with the debtor's schedules reflects a net loss of $1,793,616 on sales of $7,761,250. The debtor's schedules also reflect liabilities of $6,129,858.75 and assets of $6,073,204.45. Of those liabilities, $5,174,214.02 are asserted to be secured claims and $910,297.63 are asserted to be unsecured claims. The other liabilities, which appear to be priority claims, would amount to about $45,000.

The debtor has been in the wood and wood treatment business, as was the prior owner of the business, and sometime prior to the filing of the Chapter 7 Involuntary Petition, the debtor ceased all operations except for the treatment of wood owned by other parties. In January of 1991, the debtor had gross sales of approximately $54,000 including cash sales of $2,000 on which it sustained a loss of $160,660. This resulted in an actual cash loss of $35,000, the balance being depreciation and other non-cash items. During the month of February, the debtor's net loss from operations was over $162,000 which resulted in a cash loss of about $35,000. During February cash sales amounted to $823.94, total sales were $2,049, and about $3,300 in accounts receivable were collected. Although the March operating report has not yet been filed, the debtor's approximation of loss for the month of March is $151,000, with a cash loss of approximately $30,000. The debtor has little or no inventory at this time.

The principal officers of the debtor have no prior experience in the operation of this facility. The debtor has retained Mr. Carroll Lee Walker, the principal officer of the former owner of the business, as a consultant. His compensation has been reduced since the filing of the petition.

Testimony on the behalf of the debtor indicates that when the property was acquired in 1989 it was the debtor's intention to attempt to refinance the debt structure of the debtor. According to the testimony,

these efforts have been thwarted by various reasons, including the invasion of Kuwait by Iraq. The debtor's collection of accounts receivable and cash income from operations since the filing of the petition, amount to less than $10,000. These monies were supplemented by a $10,000 loan from Pamunkey Land Company and a $100,000 transfer of the debtor's funds from MT Bank which had been held as security for a letter of credit. These amounts have been used in the debtor's operations to pay, among other expenses, salaries due to corporate officers and employees, which in February amounted to approximately $13,693. These were reduced to $6,600 per month by a consent order entered March 25, 1991. The debtor has on hand at this time approximately $50,000 in cash. The debtor has substantially no inventory and all its assets are alleged to be subject to liens securing loans of Signet Bank and Beaverbrook Canadian Foundation.

Based on the above facts, the history of the debtor's business, and absent any promise of refinancing, which the debtor admits is necessary for reorganization, the Court would be predisposed to find that the requirements of §§ 1112(b) and (b)(1) are met. However, at the last possible moment, the debtor has come forth with a "commitment" letter in an effort to show the probability of effective reorganization of its business. Under date of March 27, the debtor received a letter from McKinley Capital Partners, Ltd., ("McKinley") the essence of which was the indication that McKinley would make an infusion of $400,000 of equity capital in exchange for a controlling interest in the operation. That infusion would be conditioned upon the debtor obtaining a $1,000,000 line of credit from a lender. Mr. William M. Osborne, III, the principal officer and President of McKinley, testified that McKinley was organized in February 1991, to engage in money management, investment banking specializing in mergers and acquisitions, and equity private placements. Prior to that time, Osborne was in the investment banking business for over 13 years with Morgan Stanley & Company, Inc. He left Morgan Stanley to create this new company and has, since its organization, engaged in one other venture involving the acquiring of the remaining interest in a timberland transaction in which the acquirer already owned a part interest in the property. Osborne has no experience in the type of business operated by the debtor. Osborne was uncertain as to what percentage of controlling interest in the debtor would be required in return for the approximately $400,000 capital investment in the debtor. His letter indicates that his firm's equity investment would amount to a sum up to $100,000. The "commitment" letter indicates that McKinley expects its expenses incurred in the venture, up to $10,000, and a transaction fee as yet undetermined to be paid by the debtor, subject to Court approval.

In spite of the fact that Osborne has reviewed historical financial records and a list of assets and liabilities, reviewed the business plans and pro forma projections of management, made additional financial assumptions and "sensitivities" as he deemed appropriate, visited the facilities of the debtor, and conducted his own independent due diligence on the Company and the industry in which it operates, he testified he is not yet in a position to determine what interest beyond a "controlling interest" in the corporation his equity capital group would insist upon. The placement of new equity also is contingent upon appropriate environmental due diligence by the debtor, which may be of some concern given the nature of the debtor's business as it relates to its wood treatment facilities. Additionally, the placement of new equity is conditioned upon the debtor arranging a million dollar line of credit on a priority basis, which Osborne believed would be secured by an interest in the property acquired (i.e., inventory) from the line of credit funds. It is to be noted that in the penultimate paragraph of the "commitment" letter it is stated that the bank financing which would occur prior to the confirmation of a plan of reorganization would be on a priority basis. Because these monies would be used during the administration of the Chapter 11 proceed-

ing, a priority would place that loan ahead of all other Chapter 11 administrative costs. Finally, Osborne stated that although several potential investors have expressed interest in investing in the debtor, none have as yet committed to participate in the venture. He expects that it would take six to eight weeks to raise the necessary investments.

■ The U.S. Trustee and the Official Unsecured Creditors' Committee have raised the issues of excessive compensation to officers and directors in the months preceding the involuntary Chapter 7 proceeding, post-petition payments to consultants employed but not approved by the Court, payment of accounting services without Court authorization, and reimbursement of expenses relating to the moving costs of the principal officers. In light of the circumstances under which the debtor operates, the existence of consultants being paid on a monthly basis, rather than being salaried employees, does not give rise to the need for Court approval of the relationship. The debtor has stated the payments to an accounting firm were not for services of an accountant but payment for the use of computer time on a mainframe system. Maintaining the salaries of the numerous officers and directors of the partnership appears to be a poor managerial decision to retain that personnel in light of the declining business and the stated volume of business during the preceding year. The salary problem has been corrected by the consent order previously entered. These issues standing alone would not warrant the granting of the request of the U.S. Trustee and the Official Unsecured Creditors' Committee. However, the belated effort to thwart the inevitable by submission of a "commitment" letter replete with contingencies, over which the debtor has no control, and which may never become fruitful while cause does not deter this Court from its conclusion that there is no reasonable likelihood of reorganization within a reasonable time and that conversion is in the best interest of the creditors and the estate.

■ In opposition to the U.S. Trustee's motion, the debtor argues that during the exclusivity period of 11 U.S.C. § 1112(b) others should be unable to bring a motion under § 1112(b). The debtor cites *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), in support of this proposition. In *Timbers* a creditor was seeking relief from the automatic stay under § 362(d)(2). The Supreme Court stated that in order for the debtor to establish that the collateral in issue is necessary to an effective reorganization, it must show, among other things, a reasonable possibility of a successful reorganization within a reasonable time. *Id.* 108 S.Ct. at 632. In the discussion of this issue, it was noted in dicta that although many courts demand less detailed showings of the prospect of reorganization during the exclusivity period, "even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." *Id.* at 633. The court in *Timbers* fails to provide debtors any extra protection during the exclusivity period as alleged by the debtor; the case merely notes some courts apply a lesser standard of proof. The Fourth Circuit's opinion in *Carolin Corporation v. Miller*, 886 F.2d 693 (4th Cir.1989), is more directly on point. The primary issue in *Carolin* was whether or not a Chapter 11 petition could be dismissed for lack of good faith filing, an issue which the court found to arise under § 1112(b). As part of its analysis, the court discussed the very issue raised by the debtor, when can the courts inquire into whether there exists a realistic possibility of an effective reorganization. *Id.* at 698. The court held that "the ability of bankruptcy courts to inquire into that critical matter at the very threshold would seem indispensable to proper accomplishment of the basic purposes of Chapter 11 protection." *Id.* [citations omitted]. Relying on *Carolin*, the Court finds that the U.S. Trustee's motion is properly before it at this time.

■ The debtor's assertion that conversion would result in no distribution to unsecured creditors, even if true, is not a basis

to deny the motion. Section 1112, under which this motion was brought, does not provide for this issue to be taken into consideration by the Court when deciding whether to convert a case.

In conclusion, the general unsecured creditors of the estate should not be required to stand by to await the outcome of a financing effort by the debtor-in-possession, while at the same time there continues to be further diminution of the estate. The $50,000 cash the debtor has on hand would be completely depleted even in the six to eight weeks the debtor states it would necessarily take to determine if appropriate investors can be obtained and a line of credit approved. The "commitment" letter is simply not reliable enough, nor binding enough, to give this Court any assurance that it will do anything more than delay the inevitable. In essence, this Court finds that the impoverished condition of the debtor with inadequate cash flow continuing and rapid loss of assets, the resultant diminution of the estate, and the lack of a reasonable likelihood of reorganization within a reasonable time is so apparent, the Court is compelled to grant the relief requested.

An appropriate Order will issue. The Clerk's Office is directed to send copies of this Memorandum Opinion to the debtor, attorney for the debtor, attorney for the Official Unsecured Creditors' Committee, Mary Harkins, Attorney for the United States Trustee and the United States Trustee.