**In re CITI–TOLEDO PARTNERS, a California Limited Partnership, Debtor.**

**Bankruptcy No. 93–33474.**

United States Bankruptcy Court, N.D. Ohio, Western Division.

June 23, 1994.

Kenneth Baker, Toledo, OH, for Comm. Const. Corp.

H. Buswell Roberts, Jr., Toledo, OH, for Active Bldg. Systems, Guardian Insulation, Inc. and Carrier Michigan Co.

Dean Wyman, Derrick Rippy, Office of the U.S. Trustee, Cleveland, OH.

John Czarnecki, Toledo, OH, for Merit Plumbing, Inc.

James Sulewski, Toledo, OH, for Maumee Valley Drywall.

Michael Kennedy, Gen. Counsel, Citi–Equity Group, Inc., Culver City, CA.

Gary Cunningham, David Hart, Southfield, MI, for debtor.

David Leta, Salt Lake City, UT, for Weybridge, Inc.

Richard Malone, Toledo, OH, for Transtar Elec. Inc.

Amy Borman, Toledo, OH, for Country Const., Inc.

**OPINION AND ORDER GRANTING MOTION OF COMMONWEALTH CONSTRUCTION CORPORATION, ET AL TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE AND DISMISSING UNITED STATES TRUSTEE'S MOTION TO APPOINT CHAPTER 11 TRUSTEE AS MOOT**

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter is before the Court on the motion of Commonwealth Construction Corporation, Merit Plumbing, Inc., Country Construction, Inc., Transtar Electric, Inc., Active Building Systems, Guardian Insulation, Inc., and Carrier Michigan Co. (collectively the "Moving Creditors") to convert the chapter 11 bankruptcy case of Citi–Toledo Partners ("Toledo I") to a case under chapter 7 pursuant to 11 U.S.C. § 1112(b). The United States Trustee ("UST") has moved for the appointment of a chapter 11 trustee under § 1104. Toledo I has filed objections to the aforementioned motions. Upon consideration of the evidence adduced on the parties' respective motions, the Court finds that the Moving Creditors' motion is well taken and should be granted. The Court further finds that the UST's motion should be dismissed as moot.

*FACTS*

Toledo I and Citi–Toledo Partners II (collectively the "Toledo Partnerships") are limited partnerships which were formed in 1990 in order to construct and operate multi-family low income housing units in Maumee, Ohio. The Court shall hereinafter refer to the properties owned by the Toledo Partnerships collectively as the "Project".

The Project consists of a 160 unit multi-family apartment complex which is approximately 90% complete. The general partners of Toledo I and Citi–Toledo Partners II ("Toledo II") are Gary Lefkowitz ("Lefkowitz") and City Equity Group, Inc. ("CEG"). Lefkowitz formerly served as the president of CEG.

The Moving Creditors' claims arose from the construction of the Project. Construction on the Project began in June 1993. Thereafter, in November of 1993, construction was discontinued when the Toledo Partnerships failed to make payments on the debts incurred on the Project.

**Prior Proceedings in This Court**

A number of the Moving Creditors filed involuntary chapter 7 petitions against the Toledo Partnerships on December 9, 1993.

The Toledo Partnerships moved to transfer venue of their bankruptcy cases to the

United States Bankruptcy Court for the Central District of California on January 14, 1994 which motion was denied by the Court.

On April 12, 1994 the Court entered a consent order which constituted an order for relief pursuant to § 303 (the "Consent Order"). The Consent Order converted the Toledo Partnerships' involuntary chapter 7 cases to voluntary bankruptcy cases under chapter 11.

The Consent Order directed the Toledo Partnerships to file statements of financial affairs and schedules of assets and liabilities within 30 days of the entry of the Consent Order. The Consent Order further directed the Toledo Partnerships to appear at a meeting of creditors conducted by the UST pursuant to § 341 and § 521.

Toledo I also sought an additional ex parte extension of time until May 19, 1994 to file its bankruptcy schedules.

### Proceedings in Other Jurisdictions Involving the Toledo Partnerships' General Partners

Lefkowitz was indicted in May of 1994 for his alleged fraudulent activities in marketing and managing partnerships in which Lefkowitz and CEG were general partners during Lefkowitz's tenure as president of CEG (the "Indictment").

Certain of the creditors of CEG (the "Minnesota Creditors") filed an involuntary bankruptcy petition under chapter 11 in the United States Bankruptcy Court for the District of Minnesota on May 18, 1994 (the "Minnesota Court"). On the same day, the Minnesota Court ordered that a trustee be appointed in CEG's bankruptcy case (the "Trustee Order").

However, the Minnesota Court stayed the Trustee Order on May 26, 1994 (the "Stay Order") in light of a stipulated agreement (the "Management Stipulation") entered into between the Minnesota Creditors, CEG and Weybridge, Inc. ("Manager"). The Stay Order incorporates both the Management Stipulation and a management agreement entered into between CEG and Manager (the "Management Agreement").

The Stay Order provides that the Trustee Order will "become fully effective" upon the expiration of the Management Stipulation which expires upon the earlier of 60 days from the date of the Stay Order, termination of the Management Agreement, or a default by the parties to the Management Stipulation.

The Management Agreement expressly provides that "[t]he actions of Manager ... shall be solely as agent for [CEG], and Manager does not assume any fiduciary relationship with or for [CEG]". *See* Management Contract, at p. 1, para. 1.2. Further, the Stay Order states that the Manager is not "deemed to be a custodian, trustee, marshall, or other officer of the court within the meaning of 18 U.S.C. § 154".

Notwithstanding the fact that the Manager is not liable as a fiduciary of CEG's estate, the Management Stipulation provides that the Manager "[will] have, consistent with the Management Contract, the right to make all decisions with respect to the operations of [CEG and certain entities controlled by CEG]". *See* Management Stipulation, at p. 7, para 4. The Management Agreement delegates substantially all of the CEG's fiduciary duties to the Manager. *See* Management Agreement, p. 4–5, para. 4.4. Included within the Manager's duties is the task of "direct[ing] and instruct[ing] counsel for [CEG] and other professionals employed by [CEG]". *See* Management Agreement, at p. 3, para. 4.1(e).

### Testimony at the Hearing on the Instant Motions

At the hearing, Kenneth Minnichiello ("Minnichiello"), president of Commonwealth Construction Corporation, testified that his company managed the construction work performed on the Project in accordance with a contract between the parties.

Minnichiello testified that, although the Toledo Partnerships experienced cash flow difficulties in July of 1993, his company continued to construct approximately 40% of the Project in reliance upon misrepresentations by CEG that CEG had sufficient funds to complete construction on the Project.

Minnichiello testified that Commonwealth has been required to furnish a security guard

at the Project twenty-four hours per day. Minnichiello further testified that Commonwealth has furnished "builder's risk" insurance on the Project. According to Minnichiello, builder's risk insurance generally covers occurrences such as fire, theft, property damage and "acts of God". However, Minnichiello testified that builder's risk insurance generally does not cover liability for personal injuries.

The Moving Creditors also presented the testimony of Michael Jacobson ("Jacobson") who is employed with CED Construction, Inc. ("CCI"), a company which specializes in developing and constructing multi-family housing projects ranging in size from 100 units to 500 units. A number of CCI's properties have been allocated low income housing tax credits. Although Jacobson testified that he has only recently been employed by CCI, Jacobson has been a member of the Michigan Bar for approximately 30 years and has specialized in the area of real estate transactions.

According to Jacobson, the low income housing tax credit is an income tax credit awarded by state agencies for multi-family low income housing properties based upon an allocation formula determined by such state agencies. The amount of the low income housing tax credit ("Credits") awarded represents a function of several factors including the cost of constructing such low income housing. Jacobson testified that the amount of financing available for low income housing tax credit properties is typically lower than that available for conventional properties because the rents which may be charged for low income housing tax credit properties are generally lower than for conventional properties.

Jacobson testified that, preliminarily, he estimated the value of the Project's real estate would be "at least" equal to the aggregate book value of the real estate listed in Toledo I and Toledo II's bankruptcy schedules if the Project could obtain Credits.

Although Jacobson testified that a developer in Ohio is by no means guaranteed an allocation of Credits, he stated that the Project could potentially generate $500,000–$600,000 in Credits. Jacobson testified that

the Project's market value could be substantially lower if the Project could not obtain an allocation of Credits. Indeed, Jacobson testified that if Credits should not be available for the Project, the value of the Project could be less than the total costs of construction for the Project.

Jacobson testified that the Credits which had been allocated to the Toledo Partnerships expired on December 31, 1993. The parties do not dispute this fact.

Jacobson also testified that in order to obtain an allocation of Credits for 1994, an application must be filed by a developer with the State of Ohio on or before September 1, 1994. Jacobson testified that if an allocation of Credits was not obtained for the Project in 1994, the next available opportunity for a developer to obtain Credits for the Project would be in May, 1995.

Jacobson testified that, generally, the value of a real estate property is impaired the longer it remains idle. In Jacobson's view, such properties typically require a period of "rehabilitation".

CEG provided the testimony of Bruce Mallory ("Mallory") a principal of Business Consultants, Inc. which has been appointed to represent CEG's creditors in the Minnesota Court. Mallory testified that, in light of the fact that he has only recently been retained to represent the creditors in CEG's bankruptcy case, he has no knowledge as to whether CEG is paying real estate taxes for the Toledo Partnerships or as to the location of the Toledo Partnerships' bank accounts.

## *DISCUSSION*

### WHETHER THE CREDITORS HAVE ESTABLISHED "CAUSE" TO CONVERT OR DISMISS TOLEDO I'S CHAPTER 11 CASE

**Applicable Statute**

Section 1112(b) provides, in pertinent part, that:

> on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under

this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation[.]

## Burden of Proof

The Moving Creditors bear the burden of proof on their motion by the preponderance of the evidence. *In re A–K Enterprises, Inc.,* 111 B.R. 149 (Bankr.N.D.Ohio 1990); *c.f. Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (stating that "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, [the Supreme Court] presume[s] that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'") (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–90, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983)) (other citations omitted).

## The Timing of the Creditors' Motion

■ Preliminarily, Toledo I argues that a court may not convert or dismiss a bankruptcy case prior to the expiration of the period during which the debtor has the exclusive right to file a plan. The Court disagrees. *See In re Woodbrook Assoc.,* 19 F.3d 312, 316 (7th Cir.1994) ("[c]reditors need not wait until the debtor's exclusive right to file a plan has expired") (citing *In re Park Ave. Partners Ltd. Partnership,* 95 B.R. 605, 609 (Bankr.E.D.Wisc.1988)); *In re Southern Int'l Co. L.P.,* 126 B.R. 223, 226 (Bankr.E.D.Va. 1991) (proper for United States Trustee to pursue motion for conversion during exclusivity period); *c.f. Johnston v. Gem Dev. Co. (In re Johnston),* 149 B.R. 158 (Bankr. 9th Cir.1992) (conversion warranted after less than 4 months subsequent to filing of petition).

## Continuing Loss to or Diminution of the Estate and Absence of a Reasonable Likelihood of Rehabilitation

■ The Court finds that the continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation of Toledo I represents "cause" for conversion or dismissal under § 1112(b). *See In re Johnston,* 149 B.R. at 162 (finding cause under § 1112(b)(1) where debtor failed to maintain sufficient insurance on premises, failed to file annual report concerning common carrier certificate, lacked income which would indicate a reasonable likelihood of rehabilitation and the positions of creditors continued to erode).

Section 1112(b)(1) contemplates a "twofold" inquiry into whether there has been a "continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation." *In re Photo Promotion Associates, Inc.,* 47 B.R. 454, 458 (Bankr.S.D.N.Y.1985) (citations omitted); *see Clarkson v. Cooke Sales And Service Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985) (bankruptcy court properly dismissed case under § 1112(b)(1) upon finding of an absence of sufficient financial data and "certain sources of income" coupled with an erosion in creditors' positions); *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.),* 749 F.2d 146, 151–52 (2nd Cir. 1984) (debtor's failure to "devise a reorganization plan grounded in reality" within 15 months of petition warranted conversion under § 1112(b)(1), (2) and (3)), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

First, the Court finds that there has been a diminution of the estate. "All that need be found is that the estate is suffering some diminution in value". *In re Kanterman,* 88 B.R. 26, 29 (S.D.N.Y.1988). The fact that Commonwealth has been required to hire a security guard, thus adding another layer of administrative expense to this bankruptcy case and further eroding the position of the estate's creditors, has diminished the value of the estate. The accumulation of real estate taxes has also impaired the value of the estate. The fact that the Project has remained idle since November of 1993 has further impaired its value.

Second, the Court finds that Toledo I does not have a "reasonable likelihood of rehabilitation". *See Clarkson,* 767 F.2d at 420 (dismissal warranted where "the absence of fi-

nancial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation"); *Tianna Queen Motel, Inc.*, 749 F.2d at 146 (conversion under § 1112(b)(1), (2) and (3) warranted in light of debtors' "failure ... to demonstrate that their prospects for prompt rehabilitation were based upon anything more substantial than [their] boundless confidence" in the 15 months after the filing of a chapter 11 petition); *see also In re Wright Air Lines, Inc.*, 51 B.R. 96, 99 (Bankr. N.D.Ohio 1985) (stating that "[r]ehabilitation as used in 11 U.S.C. Section 1112(b)(1) means 'to put back in good condition; re-establish on a firm, sound basis' ") (citation omitted).

Toledo I does not have any employees. Nor does Toledo I have any operating income which could be utilized to pay expenses such as real estate taxes. In addition, Toledo I has not demonstrated an ability to fund completion of the Project.

Furthermore, Toledo I has allowed the Project's Credits to expire. Toledo I did not provide any evidence at the hearing indicating that it would be able to obtain Credits in the future.

Lastly, although the Bankruptcy Code contemplates liquidating plans of reorganization in certain circumstances, the Court cannot equate the determination of whether Toledo I possesses a reasonable likelihood of rehabilitation with Toledo I's ability to effectuate a liquidating plan. *C.f.* § 1141(d)(3)(A) (stating that a debtor does not receive a discharge where "[a] plan provides for the liquidation of all or substantially all of the property of the estate").

**Conversion or Dismissal for Bad Faith**

■ "It is well-settled that even though Chapter 11 does not expressly so state, bad faith may serve as a ground for dismissal of a petition." *Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 392 (6th Cir.1992) (citations omitted).

At the hearing, Toledo I argued that its prepetition conduct is irrelevant to this Court's analysis of whether "cause" exists to convert or dismiss Toledo I's chapter 11 case. Similarly, Toledo I argued that its postpetition conduct during the time that Lefkowitz was in control of CEG is irrelevant to this Court's analysis under § 1112(b). On the contrary, however, the Sixth Circuit stated in *Charfoos* that " 'no list is exhaustive of all the conceivable factors that could be relevant in analyzing a particular debtor's good faith' ". *Charfoos*, 979 F.2d at 393 (quoting *In re Caldwell*, 851 F.2d 852, 860 (6th Cir.1988)). More specifically, the *Charfoos* court examined both the debtor's prepetition and postpetition conduct in determining whether to dismiss the debtor's chapter 11 case.

The Court finds Minnichiello's testimony that CEG misrepresented its ability to obtain funds to complete the Project to be probative as to Toledo I's lack of good faith.

Moreover, Toledo I's unexcused failure to file its bankruptcy schedules until June 7, 1994, two days before the hearing on this matter, evinces bad faith. *See Finstrom v. Huisinga*, 101 B.R. 997, 999 (D.Minn.1989) (affirming sua sponte dismissal by bankruptcy court based on debtor's failure to file proper statements and schedules in a case where debtor had received 30 day extension to file schedules); *c.f.* 11 U.S.C. § 1112(e) (providing for conversion or dismissal upon the request of the United States Trustee where "the debtor in a voluntary case fails to file, within fifteen days after the filing of the petition commencing such case or such additional time as the court may allow, the information required by paragraph (1) of section 521"). The Consent Order required Toledo I to file its bankruptcy schedules and statements of affairs within 30 days of April 12, 1994. Subsequently, Toledo I requested an extension of time until May 19, 1994 to file its bankruptcy schedules. Nevertheless, Toledo I failed to timely file its bankruptcy schedules and statement of affairs, further frustrating creditors' efforts to determine Toledo I's financial condition.

Significantly, as the Moving Creditors noted at the hearing, the Toledo Partnerships caused to be recorded a deed from Toledo I to Toledo II on January 21, 1994. This deed conveyed substantially all of the real estate securing Toledo II's mortgage debt. The fact that this deed was recorded is not indicated on Toledo I's statement of affairs. Nor have the Toledo Partnerships provided any

evidence indicating a legitimate business purpose for the recordation of the deed. *See In re Hartford Run Apartments of Buford, Ltd.,* 102 B.R. 130 (Bankr.S.D.Ohio 1989) (dismissal of chapter 11 case warranted where debtor failed to disclose transfers and "retransfers" of substantially all of its assets during one year period prior to filing petition in its statement of financial affairs).

Further, the Court cannot condone Toledo I's failure to file an operating statement with the UST. As the court noted in *In re Berryhill,*

> [t]imely and accurate financial disclosure is the life blood of the Chapter 11 process. Monthly operating reports are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it to do something. They are the means by which creditors can monitor a debtor's post-petition operations. *In re Chesmid Park Corp.,* 45 B.R. 153, 159 (Bankr.E.D.Va.1984). As such, their filing is very high on the list of fiduciary obligations imposed upon a debtor in possession. *In re McClure,* 69 B.R. 282, 290 (Bankr.N.D.Ind.1987).

*In re Berryhill,* 127 B.R. 427, 433 (Bankr. N.D.Ind.1991); *see Roma Group, Inc. v. United States Trustee (In re Roma Group, Inc.),* 165 B.R. 779, 780 (S.D.N.Y.1994) (stating that failure to file operating reports constitutes cause for dismissal) (citations omitted); *Finstrom,* 101 B.R. at 999 (dismissal appropriate for failure to file proper statements and schedules) (citations omitted); *In re Great American Pyramid Joint Venture,* 144 B.R. 780, 790 (Bankr.W.D.Tenn.1992) (stating that failure to file operating reports may represent "cause") (citation omitted).

In addition, Toledo I has failed to provide the UST with proof of liability insurance. Toledo I's failure to provide the UST with such information hampers efforts by the UST in monitoring the estate. More importantly, if Toledo I has, in fact, failed to obtain insurance, such failure subjects the estate to potential liability for personal injuries incurred at the Project.

Despite the fact that Toledo I agreed to appear at a § 341 meeting conducted by the UST under the terms of the Consent Order, Toledo I has failed to submit to such an examination during the period subsequent to entry of an order for relief. *See In re Chandler,* 89 B.R. 1002, 1004–5 (N.D.Ga.1988) (although finding that debtor's failure to attend § 341 meeting because of a coronary heart condition did not warrant dismissal of debtor's case, the court stated that "[w]here a bankruptcy debtor's failure to attend a § 341 meeting is found to be part of an evidentiary tapestry illustrating that the debtor is enjoying the benefits and protections of the bankruptcy laws while not reorganizing or providing creditors with needed information, dismissal may be appropriate"); *In re Cannon,* 143 B.R. 805 (Bankr.W.D.N.Y.1992) (dismissal for "cause" warranted where debtor failed to appear for three § 341 meetings and failed to provide United States Trustee with information relating to debtor's financial affairs).

The Court shares the UST's concerns with Toledo I's delegation of substantially all of its fiduciary duties to the Manager in light of the fact that the Manager does not bear the responsibilities of a fiduciary to this estate. *C.f. In re William A. Smith Constr. Co.,* 77 B.R. 124, 127 (Bankr.N.D.Ohio 1987) (finding that having a consultant serve "at the helm" of debtor corporation did not comport with the managerial requirements set forth in § 1107 and § 1108 in appointing a trustee).

Toledo I's citation of *In re Cardinal Industries, Inc.* is unavailing. In *In re Cardinal Indus., Inc.,* the bankruptcy court appointed an operating trustee which trustee served as general partner in a number of limited partnerships. *See In re Cardinal Indus., Inc.,* 109 B.R. 755 (Bankr.S.D.Ohio 1990) (appointing trustee). In contrast to the facts presented in *In re Cardinal Indus., Inc.,* the parties in the Minnesota Court specifically sought to avoid the appointment of a trustee in CEG's bankruptcy proceeding. Notwithstanding the arguments of the Manager at the hearing, the Stay Order and the documents that it incorporates indicate that the Manager does not bear the fiduciary responsibilities of a trustee in the Toledo Partnerships' bankruptcy cases.

### WHETHER TO CONVERT OR DISMISS TOLEDO I'S BANKRUPTCY CASE

The Court finds that conversion of Toledo I's bankruptcy case is warranted.

■ In the instant case, as in *In re Staff Inv. Co.,* "where there is not continuing revenue-generating activity" the best interests of creditors and the estate favor conversion. *In re Staff Inv. Co.,* 146 B.R. 256, 261 (Bankr. E.D.Cal.1993) (footnote omitted).

■ Moreover, the fact that creditors will likely enjoy greater rights in bankruptcy court than they would enjoy in state court militates in favor of conversion. As the court stated in *In re Staff Inv. Co.,*

> [a] chapter 7 trustee has a veritable arsenal of bankruptcy and nonbankruptcy rights. The trustee's basic bankruptcy avoiding powers may bear fruit. [Additionally,] [t]he trustee has a claim, based on federal law, against each of the general partners for any insufficiency of assets to pay liabilities."

*In re Staff Inv. Co.,* 146 B.R. at 261 (citing 11 U.S.C. § 723). The fact that a bankruptcy trustee may be able to pursue claims against CEG and Lefkowitz under § 723 strongly favors conversion of Toledo I's bankruptcy case.

■ Furthermore, in circumstances where a debtor has failed in performing its fiduciary duties, conversion rather than dismissal is warranted. *See In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 818 (Bankr.N.D.N.Y.1989) (conversion warranted where debtor's pre and postpetition misconduct convinced court that the appointment of an independent trustee was warranted to objectively determine the "affairs of the estate" and to "begin to maximize its value for the benefit of [the debtor's creditors]") (citation omitted); *In re W.J. Rewoldt Co.,* 22 B.R. 459, 462 (Bankr. E.D.Mich.1982) (conversion warranted where debtor had failed to properly perform fiduciary duties) (citation omitted).

Most importantly, the Court finds that conversion to chapter 7 will maximize the value of the estate available to creditors. Even if the Moving Creditors had favored dismissal, the above considerations mandate conversion of Toledo I's case.

In light of the foregoing, it is therefore

ORDERED that the Moving Creditors' motion to convert Toledo I's chapter 11 bankruptcy case to a case under chapter 7 be, and it hereby is, granted. It is further

ORDERED that the United States Trustee's motion to appoint a trustee be, and it hereby is, dismissed as moot. It is further

ORDERED that, pursuant to 11 U.S.C. § 348(a), the conversion of this bankruptcy case to a bankruptcy case under chapter 7 constitutes an Order for Relief under Chapter 7 in the bankruptcy case of Toledo I. It is further,

ORDERED that pursuant to § 348(c) and 11 U.S.C. § 342, the Clerk of this Court shall give "such notice as is appropriate of an Order for Relief in a case under this Title." It is further

ORDERED that, pursuant to Bankruptcy Rules 1019(2) and 2002(f)(4), the Clerk of this Court shall give notice of the entry of this Order of conversion. It is further,

ORDERED that, pursuant to Bankruptcy Rule 1019(5), CEG shall forthwith turn over to the Interim Chapter 7 Trustee, all records and property of the estate in its possession or control. It is further,

ORDERED that Toledo I, by its general partners CEG and Lefkowitz, prepare and file in this Court, within 30 days of the date of this Order, a separate schedule listing unpaid obligations incurred after the filing of the petition under Chapter 11, including the amounts owing, the creditors' names and their addresses or places of business, including matrix, and a statement of all contracts, executory in whole or in part, assumed or entered into after the filing of the petition, together with a final report and account showing all receipts and disbursements of funds, in accordance with Rule 1019(5), Rules of Bankruptcy Procedure. It is further

ORDERED that CEG and Lefkowitz shall each file with the Court statements of their individual assets and liabilities within 30 days from the date of this Order pursuant to Bankruptcy Rule 1007(g).