### In re ABEPP ACQUISITION CORP., dba Abbott & Company, Debtor.

### Bankruptcy No. 95–32313.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Jan. 11, 1996.

William Schoenberg, Cleveland, Ohio, for Debtor.

Mary Ann Whipple, Toledo, Ohio, for Unsecured Creditors' Committee.

Yvonne Tertel, Toledo, Ohio, for Ohio Bureau of Workers' Compensation.

Mark Froehlich, Newark, DE, for Allied Wire and Cable, Inc.

Susan Bruder, Office of Marion County Treasurer, Marion, Ohio.

Derrick Rippy, Office of the U.S. Trustee, Cleveland, Ohio.

---

Michael Jones, Joan Torzewski, Toledo, Ohio, for United Auto Workers.

Jeffrey Schwartz, Stacey Ballen–Stier, New York City, for IBJ Schroder.

Charles Paull, Marion, Ohio.

## OPINION AND ORDER CONVERTING CHAPTER 11 CASE TO CASE UNDER CHAPTER 7

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on for hearing on the Court's own motion as to why the chapter 11 case of ABEPP Acquisition Corp., dba Abbott & Company (the "DIP") should not be converted to a case under chapter 7 or dismissed pursuant to § 1112(b). Upon consideration of the evidence adduced at the January 10, 1996 hearing on this matter, this Court converted the DIP's case to a case under chapter 7 pursuant to § 1112(b), based primarily on the continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation of the DIP. This opinion sets forth the Court's findings of fact and conclusions of law.

### FACTS

The DIP filed a petition under chapter 11 of title 11 on September 15, 1995 (the "Petition Date").

Prior to the Petition Date, the DIP manufactured electrical wiring harnesses.

The DIP presently owns three facilities located in Marion, Ohio (the "Marion Site"), Prospect, Ohio (the "Prospect Site") and Lafayette, Georgia (the "Georgia Site").

The DIP ceased operations at the Prospect Site and the Marion Site at the end of September, 1995. The DIP discontinued operations at the Georgia Site at the end of October, 1995.

The DIP presently has five employees, including Charles Paull ("Paull"), the DIP's president. The DIP's present employees include an accountant, a personnel manager and two maintenance workers.

### The DIP's Assets

The DIP has estimated the values of the real estate for the Marion Site, the Prospect Site and the Georgia Site at $1,135,000.00, $130,000.00, and $150,000.00, respectively.

The DIP scheduled personal property of $2,587,931.81 as of the Petition Date. This amount was principally comprised of accounts receivable in the amount of $1,059,-971.11, inventory in the amount of $1,196,-025.00, and "perishable" tooling in the amount of $233,115.00.

Paull estimated the DIP's current accounts receivable at $120,000.00–$140,000.00, including a note receivable from Flexible Corporation.

Paull testified that the DIP's "specialty assets" had been sold for approximately $345,000.00.

Paull testified that the DIP also possessed a cause of action for breach of contract against Whirlpool on the Petition Date (the "Whirlpool Suit"). Paull testified that the DIP had obtained two separate legal opinions which indicated that the Whirlpool Suit had a value of at least $475,000.00. Paull testified that the DIP communicated a settlement offer to Whirlpool on or about the time of the Petition Date. The DIP failed to schedule this cause of action in its bankruptcy schedules.

### The DIP's Liabilities

IBJ Schroder Bank & Trust ("IBJ") held a secured claim on the Petition Date in the amount of $1,682,137.00. Paull testified that the DIP presently owes IBJ $1,100,000.00. The DIP and IBJ have agreed that IBJ's claim is secured by substantially all of the DIP's real and personal property.

The DIP had $298,990.56 in unsecured priority claims on the Petition Date, composed primarily of tax claims in the amount of $237,662.39. The DIP also had $6,122,072.36 in unsecured nonpriority claims on the Petition Date.

Paull testified that the DIP was a defendant in pending litigation on the Petition Date. Specifically, the DIP's application to employ Frericks and Howard as special counsel for the estate indicates pending liti-

gation against the DIP in actions including *Trimble v. Abbott & Co.*, and *Rouse v. Abbott & Co.* These matters were not scheduled in the DIP's statement of affairs.

### The DIP's Postpetition Operations

The DIP's most recent operating statements indicate that the DIP suffered losses for October, 1995 and November, 1995 of $74,830.00 and $62,705.00, respectively.

The DIP's officers received postpetition payments from the DIP for September 16, 1995 through November 30, 1995 in the following amounts:

| Officer | Amount |
|---|---|
| Eric Dardinger ("Dardinger") | $ 41,209.73 |
| John Mitchell ("Mitchell") | $ 57,428.42 |
| Charles Paull | $ 25,732.21 |
| Total | $124,370.36 |

Notably, the annual gross salaries for Dardinger, Mitchell, and Paull for the year ended prior to the Petition Date approximated $76,126.07, $83,851.88 and $129,886.77, respectively. *See* DIP's Statement of Financial Affairs, Question 3.

Paull testified that these amounts included severance payments to Dardinger, the DIP's former chief financial officer, and to Mitchell, the DIP's former vice president of customer services. The DIP's severance payments to Dardinger and Mitchell approximated $25,362.50 and $46,889.51, respectively. *See* October Financial Reports, Form 6, Statements of Compensation.

Paull testified that the DIP made a "severance" payment to him in the amount of $26,800.00 during the week prior to the hearing on this matter, despite the fact that he is still employed by the DIP. According to Paull, the DIP presently owes him an additional $80,000.00 in accrued severance pay.

Paull was unaware of any written documents which memorialize the DIP's severance policy. Paull testified that the severance payments to Dardinger, Mitchell and Paull were based on the officers' prior years of service with the DIP. Paull testified that, on the Petition Date, the officers were entitled to the severance payments which they received from the DIP.

Paull testified that the DIP's monthly salary expenses subsequent to the date of this hearing should approximate $17,000.00, including Paull's monthly salary of $9,585.70.

### DISCUSSION

■ The Court finds that the continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation of the DIP represents "cause" for conversion or dismissal under § 1112(b). The DIP's conduct of its chapter 11 case further supports a finding of "cause".

### Applicable Statute

Section 1112(b) provides, in pertinent part, that:

on request of a party in interest or the United States trustee, ... and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation[.]

### Whether "Cause" Exists to Convert or Dismiss the DIP's Chapter 11 Case

There has been a "continuing loss to or diminution of" the estate. 11 U.S.C. § 1112(b)(1). "All that need be found is that the estate is suffering some diminution in value". *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y.1988). The DIP's operating statements for October and November indicate that the DIP has suffered continuing losses. In addition, the DIP's postpetition severance payments to Mitchell, Dardinger and Paull have drained the estate of cash in the amounts of $46,889.51, $25,362.50 and $26,800.00, respectively. *Cf. In re Citi–Toledo Partners*, 170 B.R. 602, 606 (Bankr.N.D.Ohio 1994) (wherein this court found that the accumulation of real estate taxes and payments to security guard constituted continuing diminution of estate in circumstances where debtor did not have any cash flow); *In re Greene*, 57 B.R. 272, 276–77 (Bankr.S.D.N.Y.1986) (finding that estate, which was comprised of real

estate, was suffering continuing diminution in value based on accruing real estate taxes and insurance premiums on real property).

Further, the Court finds that the DIP does not have a "reasonable likelihood of rehabilitation". As the court stated in *In re Wright Air Lines, Inc.,* "[r]ehabilitation as used in 11 U.S.C. Section 1112(b)(1) means 'to put back in good condition; re-establish on a firm, sound basis' ". *In re Wright Air Lines, Inc.,* 51 B.R. 96, 100 (Bankr.N.D.Ohio 1985) (citation omitted).

First, the DIP has ceased operations and intends to liquidate. *See In re Kanterman,* 88 B.R. at 29 (finding that debtor's conceded intention to liquidate evidenced lack of reasonable likelihood of rehabilitation); *see also In re Great American Pyramid Joint Venture,* 144 B.R. 780 (Bankr.W.D.Tenn.1992) (finding that debtor's cessation of operations supported finding of "cause" under § 1112(b)(1)). Second, the DIP does not have any operating income which could be utilized to pay its expenses. Third, the DIP has retained only 5 employees who are engaged in liquidating the DIP's business. *Cf. Trident Associates Ltd. Partnership v. Metropolitan Life Ins. Co. (In re Trident Associates Ltd. Partnership),* 52 F.3d 127 (6th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 188, 133 L.Ed.2d 125 (1995) (finding that "cause" existed for dismissal in circumstances where debtor had no employees, debtor was not engaged in an ongoing business, debtor was a newly created entity, and property of the estate was a single asset); *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985) (finding dismissal warranted in circumstances where debtor was a corporate shell).

Moreover, as in *In re Citi–Toledo Partners,* "the Court cannot equate the determination of whether [a debtor-in-possession] possesses a reasonable likelihood of rehabilitation with [a debtor-in-possession's] ability to effectuate a liquidating plan." *In re Citi–Toledo Partners,* 170 B.R. 602, 607 (Bankr. N.D.Ohio 1994) (citing § 1141(d)(3)(A)); *see also In re Kanterman,* 88 B.R. at 29 (noting the distinction between a debtor's ability to effectuate a liquidating plan of reorganization and a debtor's rehabilitation).

The DIP's conduct of its chapter 11 case further supports a finding of "cause" under § 1112(b). *Cf. Michigan Nat'l Bank v. Charfoos (In re Charfoos),* 979 F.2d 390, 394–95 (6th Cir.1992) (finding dismissal for "cause" warranted under § 1112(b) based on debtor's prepetition misconduct in state court proceedings and misstatements of fact in bankruptcy proceeding).

Most significantly, creditors were entitled to notice and a hearing prior to the DIP's severance payments to Dardinger, Mitchell and Paull in the respective amounts of $25,-362.50, $46,889.51 and $26,800.00. *In re Forster,* 162 B.R. 478, 482 (Bankr.N.D.Ohio 1993) (citing 11 U.S.C. 363(b)(1) and Fed. R.Bankr.P. 6004) (other citation omitted). The severance payments to Dardinger and Mitchell were the type of transactions of which a reasonable creditor would expect to receive notice in a chapter 11 case, particularly in a case where a debtor is liquidating its business. The DIP's "severance" payment to Paull, who has not been terminated by the DIP, is even more surprising. The Court further notes that, in light of Paull's testimony that the DIP's "severance" payments to Dardinger, Mitchell and Paull were based on the officers' length of service, the severance payments were likely not entitled to administrative expense treatment. *See In re Health Maintenance Foundation,* 680 F.2d 619, 621–22 (9th Cir.1982) (finding that severance pay at termination based on length of service was not entitled to administrative expense treatment under the Bankruptcy Act); *see also In re Rawson Food Services, Inc.,* 67 B.R. 351 (M.D.Fla.1986).

At the hearing on this matter, the DIP argued that the severance payments to Dardinger, Mitchell and Paull were approved by this Court's execution on November 8, 1995 of the "Order Authorizing Payment Of Prepetition Employee Wages, Salaries And Related Items, Reimbursement Of Prepetition Employee Business Expenses, And Payments For Which Payroll Deductions Were Made" (the "Emergency Pay Order"). Suffice it to say that even a generous reading of the Emergency Pay Order does not support the DIP's argument. True, this Court's November Emergency Pay Order approved the payment of $40,892.99 in wages for salaried

employees and $33,964.20 for hourly employees, including payments to Dardinger, Mitchell and Paull in the respective amounts of $3,125.32, $3,250.13 and $4,792.85. However, this Court's November Emergency Pay Order can in no way be construed as placing the Court's imprimatur on the DIP's October, 1995 severance payments to Dardinger and Mitchell or the DIP's January, 1996 "severance" payment to Paull.

Likewise, the Court rejects the DIP's argument that the Court's execution of a cash collateral order between the DIP and IBJ, to which the DIP had appended a proposed operating budget listing an aggregate line item for "Severance", approved the DIP's payment of the severance payments to Dardinger, Mitchell and Paull.

The Court finds the DIP's assertion that its postpetition payment of the officers' severance pay was proper is particularly troubling in light of the fact that Paull, who remains in control of the DIP, testified that the DIP still owes him $80,000.00 in severance payments.

The DIP failed to schedule the Whirlpool Suit, which lawsuit apparently represents a significant asset of the estate. Likewise, the DIP did not schedule the two state court lawsuits in which the DIP appears as a defendant and has apparently allowed these lawsuits to proceed against the estate. *Cf. Ostano Commerzanstalt v. Telewide Systems, Inc.*, 790 F.2d 206, 207 (2nd Cir.1986) (per curiam) (holding that debtor may not waive automatic stay of § 362(a) as the purpose of stay is to protect creditors as well as debtor) (citing *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3rd Cir.1982)).

**Whether to Convert or Dismiss the DIP's Chapter 11 Case**

█ The Court finds that conversion of the DIP's bankruptcy case is warranted.

The DIP's operations ceased in October, 1995. Therefore, the estate cannot obtain a benefit from selling the DIP's assets as a "going concern".

Moreover, "[a]s the trustee's powers to recover property are generally greater than would be available outside of bankruptcy, this factor tends to favor conversion where there is not continuing revenue-generating activity." *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr.E.D.Cal.1993) (footnote omitted). Conversion, rather than dismissal, will preserve the benefit of the DIP's cause of action against Whirlpool for the benefit of the estate. Conversion will also permit a trustee to pursue preferential payments to creditors, including a potential preferential transfer to Getzler & Co., the DIP's former management consultants, on September 11, 1995 in the amount of $73,840.11.

In light of the foregoing, it is therefore

ORDERED that the DIP's chapter 11 case be, and it hereby is, converted to a case under chapter 7. It is further

ORDERED that, pursuant to 11 U.S.C. § 348(a), the conversion of this case to a case under chapter 7 constitutes an Order for Relief under Chapter 7. It is further,

ORDERED that pursuant to 11 U.S.C. sections 348(c) and 342, the Clerk of this Court shall give "such notice as is appropriate of an Order for Relief in a case under this Title." It is further

ORDERED that, pursuant to Bankruptcy Rules 1019(2) and 2002(f)(4), the Clerk of this Court shall give notice of the entry of this Order of conversion. It is further,

ORDERED that, pursuant to Bankruptcy Rule 1019(4), the DIP shall forthwith turn over to the Interim Chapter 7 Trustee, all records and property of the estate in its possession or control. It is further,

ORDERED that the DIP, by its president Charles Paull, prepare and file in this Court, within 30 days of the date of this Order, a separate schedule listing unpaid obligations incurred after the filing of the petition under Chapter 11, including the amounts owing, the creditors' names and their addresses or places of business, including matrix, and a statement of all contracts, executory in whole or in part, assumed or entered into after the filing of the petition. It is further,

ORDERED that the DIP, by its president Charles Paull, prepare and file its financial reports for the period from December 1, 1995 through January 10, 1996 within 30 days from the date of this Order, in accordance with the guidelines promulgated by the Of-

fice of the United States Trustee. It is further

ORDERED that this Court's oral injunction effective as of 1:00 o'clock P.M. on January 10, 1996, which injunction prohibits the DIP, its officers, its employees, or IBJ Schroder from disbursing any of the DIP's funds in their possession, be, and it hereby is, continued pending further Order of this Court.