### In re ORIGINAL IFPC SHAREHOLDERS, INC., Debtor.

### No. 04 B 13843.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 19, 2004.

---

Kathryn Gleason, for Movant/U.S. Trustee.

Michael J. Chmiel, for Respondent/Debtor.

Charles H.R. Peters, Chicago, IL, for Creditor.

## MEMORANDUM OPINION

JACQUELINE P. COX, Bankruptcy Judge.

The procedural history of this matter is relatively straightforward. The debtor-in-possession, Original IFPC Shareholders, Inc. ("IFPC"), incorporated under Illinois law in 1995 for the sole purpose of prosecuting a trade-secret-misappropriation claim against AT & T Wireless Devices, Inc. ("AT & T") and Hughes Network Systems, Inc. in the Circuit Court of Du-Page County, Illinois (Case No. 93 CH 1065). The decade-old claim became one of two bankruptcy-estate assets after IFPC filed a Chapter 11 bankruptcy case on April 7, 2004. By that time two state court judgments had been entered in favor of the defendants. The first judgment resulting from a bench trial was reversed on appeal after the Appellate Court of Illinois found that the plaintiff had a right to trial by jury. The second trial was by jury; it produced the same result after a six-week trial in 2003, a verdict in favor of the defendants.

By means of its July 6, 2004 Chapter 11 Plan of Reorganization, IFPC intends to use the second estate asset, a bank account worth approximately $17,000, and expected post-petition investments of approximately $1,750,000 (given priority repayment status under the plan) to finance both an appeal seeking a third trial and the third trial, should the second adverse verdict get reversed on appeal. The proceeds from an IFPC triumph in a third trial would fund 100% payment of all allowed prepetition and postpetition claims plus interest under the proposed plan, with equity security holders retaining their ownership interests in the debtor corporation.

IFPC totaled the nonpriority unsecured claims in this case at $14,828,444, an amount which can be broken down into three groups: 1) a group of investors holding a "Promissory Note and Equity

Interest;"[1] 2) a group of professionals providing legal, expert-witness, and other litigation-support services for the trial of the trade secret claim;[2] and 3) AT & T's and Hughes' contingent, unliquidated, and disputed claims for costs as prevailing defendants in the state court litigation—claims which will ultimately be valid only if IFPC continues to lose in state court. The listings for the first group do not reveal whether one portion of each scheduled dollar amount is attributable to a promissory note and the other portion to an equity interest or, alternatively, whether each dollar represents both types of interests.

The U.S. Trustee filed a "Motion to Convert or Dismiss Case" pursuant to 11 U.S.C. § 1112(b), arguing that IFPC did not file this Chapter 11 case in good faith, that it has no real need for business-reorganization bankruptcy relief, that its plan is both unconfirmable and unfeasible, and that the true creditor body (as opposed to shareholders) will not be well served by continued prosecution of the trade-secret-misappropriation claim in state court.

### Discussion and Analysis

#### A. Continuing Loss and Inability to Rehabilitate under § 1112(b)(1)

■ As the first basis for dismissal or conversion to Chapter 7, the U.S. Trustee relies on § 1112(b)(1), which provides in pertinent part as follows:

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee ..., and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest

of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation....

11 U.S.C. § 1112(b). Each of the two elements in subsection (1) must be present for this ground to apply. 7 Lawrence P. King et al., *Collier On Bankruptcy* ¶ 1112.04[5][a], at 1112–30 (15th ed. rev. 2004)

■ In this case, the debtor IFPC has continued to incur post-petition quarterly U.S. Trustee fees and administrative costs, primarily for legal representation in this bankruptcy case, and will continue to incur costs of up to $1,750,000 for legal representation in the state court litigation (assuming it wins the first of at least two rounds) if IFPC concurrently remains in Chapter 11. It is undisputed that IFPC sells no goods or services to produce a cash flow to raise this amount; IFPC would be required to gather post-petition investors to either lend this amount and/or buy additional stock. The U.S. Trustee, furthermore, has established the "continuing loss" element of § 1112(b)(1): IFPC has an ongoing negative cash flow resulting in a net decrease in value and no definite source of income. *See In re Citi-Toledo Partners*, 170 B.R. 602, 606–07 (Bankr.N.D.Ohio 1994); 7 King et al., *supra*, ¶ 1112.04[5][a][I], at 1112–31.

■ The second "standard under section 1112(b)(1) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." 7 King et al., *supra*, ¶ 1112.04[5][a][ii], at 1112–33. In a traditional Chapter 11 case, the second element, whether the debtor has a "reason-

---

1. Approximately 87 persons invested around $14,000,000.

2. Approximately 18 creditors hold around $750,000 in litigation-related claims.

able likelihood of rehabilitation," would not turn on the anticipated future outcome of a single lawsuit, because cash flow from another valuable activity would provide the means for paying at least a portion of prepetition debt from post-confirmation profits. In this unusual case, however, the "reasonable likelihood of rehabilitation" test must be conflated with the anticipated future outcome of a single lawsuit. This would be a difficult task were the cause of action at the discovery stage, having never been tried once. In this case, however, two neutral triers of fact, a judge and a jury, have independently evaluated the debtor's claim on the merits and found its primary asset to be worth zero. While the third time might indeed be a charm (assuming that the appellate court or trial court first orders a new trial), this information is simply too much to ignore and must be given substantial weight in an evaluation of the totality of the circumstances under both subsections 1112(b)(1) and (b)(2). Aside from the unwieldy task of acquiring and then taking a third bite at the apple, the debtor has no other "business plan" that would reverse the negative cash flow. *Cf. Quarles v. U.S. Trustee,* 194 B.R. 94, 98 (W.D.Va.), *affirmed, Quarles v. Miller,* 86 F.3d 55 (4th Cir.1996). Its "premise that outcomes in pending litigation favorable to him will cure [its] financial ills is pure speculation." *Id.* at 96–97; *see also Matter of Imperial Heights Apartments,* 18 B.R. 858, 863–64 (Bankr. S.D.Ohio 1982); *In re Citi–Toledo Partners,* 170 B.R. 602, 606–07 (Bankr. N.D.Ohio 1994); *In re N.R. Guaranteed Retirement,* 112 B.R. 263, 278–79 (Bankr. N.D.Ill.1990),[3] *affirmed,* 119 B.R. 149 (N.D.Ill.1990). "When visionary schemes

for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order." *In re Great American Pyramid Joint Venture,* 144 B.R. 780, 790–91 (Bankr.W.D.Tenn.1992).

The Court concludes that cause for conversion or dismissal has been established under § 1112(b)(1).

### B. Inability to Effectuate a Plan under § 1112(b)(2)

■ The U.S. Trustee similarly requests conversion or dismissal due to the debtor-in-possession's "inability to effectuate a plan." 11 U.S.C. § 1112(b)(2). Other courts have focused on two different types of issues in applying this standard: the existence of a viable business enterprise as well as the more technical Chapter 11 plan-confirmation standards. *See* 7 King et al., *supra,* ¶ 1112.04[5][b], at 1112–34 to –39.

### 1. Feasibility Issues

As to the first type of issue, it overlaps with the plan-confirmation requirement of § 1129(a)(11), which mandates that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). On either account, it is significant that the debtor has no marketable goods or services and no other types of income-producing investments that would sustain payments to pre-petition and post-petition creditors if any

---

**3.** "In the argument that followed the hearing in this case, counsel for N.R. suggested that this apparent shortfall would be made up from the proceeds of N.R.'s state court action against the title company, but no evidence

was presented [by the debtor-in-possession] to allow for any valuation of that lawsuit."

*In re N.R. Guaranteed Retirement,* 112 B.R. 263, 278–79 (Bankr.N.D.Ill.1990).

one of its uphill litigation battles does not resolve in its favor. *See* 7 King et al., *supra,* ¶ 1112.04[5][b][ii], at 1112–35. As discussed, the two prior losses against AT & T and Hughes indicate at the very least that the evidence is not overwhelmingly in IFPC's favor, and other than the cause of action, no means of satisfying claims (aside from liquidating the bank account) are available. By its own estimation, IFPC must raise at least $250,000 to prosecute its appeal and $1,500,000 to prevail in a new trial; not discussed at the hearing is the further cost of defending a judgment on a third appeal that would probably be filed by AT & T or Hughes should IFPC prevail on the second appeal and at the third trial. IFPC has submitted a chart dated July 21, 2004, listing sixteen individuals who have purportedly committed the $250,000 for the appeal. Because no testimony was presented corroborating the information summarized in the chart, and because no accompanying contracts or other documents indicate whether any of the listed individuals are actually legally bound to the commitments, the evidentiary weight of the chart is limited. *Cf. In re Great American Pyramid Joint Venture,* 144 B.R. 780, 786–87 (Bankr.W.D.Tenn.

1992). Even if the Court were to give it full weight, still lingering is the question of how the $1,500,000 in attorneys' fees for the third trial will be funded (not to mention the costs of a potential third appeal). *Cf. Tennessee Pub. Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936)[4]; *Matter of Woodbrook Associates,* 19 F.3d 312, 322 (7th Cir.1994); *Great American Pyramid,* 144 B.R. at 792.[5] IFPC has not produced enough evidence to give the Court any confidence that this funding will materialize, particularly in light of the fact that an accurate disclosure of the investment risk would have to discount the likelihood of success as a result of the two prior fact finders' neutral evaluation of the claim at zero after full evidentiary presentations. *Cf. Matter of Imperial Heights Apartments,* 18 B.R. 858, 863–64 (Bankr.S.D.Ohio 1982).[6] " 'Creditors are entitled to a prompt determination of efficacy.' " 7 King et al., *supra,* ¶ 1112.04[5][b][ii], at 1112–36 (quoting *In re Timbers of Inwood Forest Assocs.,* 808 F.2d 363, 374 (5th Cir. 1987) (concurring opinion)).

To prevail, the U.S. Trustee must meet his burden of proof by a pre-

---

**4.** "However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tennessee Pub. Co. v. American Nat. Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936).

**5.** A reorganization plan under chapter 11 must be more than a nebulous speculative venture and must have a realistic chance of success which would lead to rehabilitation, and if outside financing is needed, it must be clearly in sight. *In re K.C. Marsh Co., Inc.,* 12 B.R. 401 (Bankr.D.Mass.1981). The Bankruptcy Code does not guarantee successful reorganization, nor does it provide a framework within which the debtor may indefinitely operate; rather, it only provides a breathing period for the debtor to seek to re-

organize. *In re Jones,* 115 B.R. 351 (Bankr. N.D.Fla.1990).

*In re Great American Pyramid Joint Venture,* 144 B.R. 780, 792 (Bankr.W.D.Tenn.1992).

**6.** As the court in *Imperial Heights Apartments* so aptly stated:

At best, the estate consists only of an alleged cause of action for a lawsuit claiming a tenuous equity in an apartment complex. There is not even an insinuation that capital is available to fund a viable plan of reorganization, nor even to bear typical administrative expenses. Such absence of an economic entity reflects both upon "the reasonable likelihood of rehabilitation" and the "inability to effectuate a plan."

*Matter of Imperial Heights Apartments, Ltd.,* 18 B.R. 858, 864 (Bankr.S.D.Ohio 1982).

ponderance of the evidence. *See In re Citi–Toledo Partners,* 170 B.R. 602, 606 (Bankr.N.D.Ohio 1994). Nonetheless, practical considerations such as the difficulty of proving a negative require that the debtor-in-possession bear the burden of production on issues of post-petition financing once the U.S. Trustee has adequately raised the issue under § 1112(b)(2); that is, the debtor-in-possession must produce information to which it has the best access. *See also Matter of Woodbrook Associates,* 19 F.3d 312, 317 (7th Cir.1994) ("That HUD bears the burden of persuasion, however, does not eviscerate Woodbrook's obligation to produce evidence in opposition to a well-supported motion."); *Matter of King,* 83 B.R. 843, 847 (Bankr.M.D.Ga.1988) (once creditor establishes *prima facie* bad-faith filing, burden of establishing legitimate reorganizational purpose shifts to debtor).

### 2. Plan–Confirmation Obstacles

The second type of issues under § 1112(b)(2) is the kind relating to Chapter 11 plan-confirmation standards that could not reasonably be satisfied by the debtor-in-possession's proposed reorganization plan. *See Matter of Woodbrook Associates,* 19 F.3d 312, 316 (7th Cir.1994); *In re Great American Pyramid Joint Venture,* 144 B.R. 780, 791 (Bankr.W.D.Tenn. 1992). The "Plan of Reorganization" in this case suffers several infirmities that are obstacles to confirmation.

For instance, under the plan, "Class 4–Priority Claims of Post–Petition Investors" consists of those who will be funding the aforementioned $1,750,000 ($250,000 plus $1,500,000) and will be repaid 100% plus interest before Class 5, consisting of general unsecured pre-petition creditors, will be paid.[7] Class 6 and Class 7 consist of two other types of pre-petition general unsecured creditors, including certain promissory note holders and AT & T's and Hughes' contingent and unliquidated claims for prevailing-defendant court costs. Most critically, the plan goes on to provide that after the Class 5 creditors are paid in full—but not after the Classes 6 and 7 creditors are paid in full—the Class 4 claimants will receive an additional 2000% payment on their claims, for a total payment of 2100%. Although the plan is not clear in this respect, the extra 2000% payment either trumps Class 6's and Class 7's right to full payment, or it dilutes the pool of money that (the debtor-in-possession assumes) will be available to pay the unsecured creditors of Class 6 and Class 7. This arrangement is problematic for either of two reasons. According to § 1129(a)(7), each Chapter 11 plan claimant under Class 6 and Class 7 is entitled at least to an amount, in present value terms, that is equal to what it would receive had IFPC been liquidated under Chapter 7. Because the fate of the debtor's primary asset, the cause of action, is highly speculative, this

---

7. In different contexts, this Chapter 11 case has presented confusing questions of what is debt and what is equity. Here, Chapter 11 plan Class 4 appears to provide treatment for some sort of administrative claims entitled to priority payments under the plan, meaning that the class claimants do or will presumably hold some sort of postpetition, pre-confirmation debt instrument. However, the aforementioned July 21, 2004 chart lists the individuals contributing the $250,000 for the appeal costs as the "New Capitol [sic] List,"

implying that these investors are purchasing stock in the debtor-in-possession rather than loaning money.

Corporate debtors can issue new securities upon confirmation of a Chapter 11 plan, 11 U.S.C. §§ 1123(a)(5)(J) & 1129(a)(4), but that type of new interest is completely different from a priority administrative expense claim in a bankruptcy case—a claim that could never accrue after Chapter 11 plan confirmation, *see* 11 U.S.C. §§ 503(b), 364(a)-(c), 507(a)(1), & 1129(a)(9)(A).

amount might be very low or nothing at all; a Chapter 7 trustee could choose to either pursue it or abandon it to the debtor and liquidate the $17,000 bank account. Suffice it to say, though, that whatever funds would be available in a hypothetical Chapter 7 liquidation, the amount of such recovery will be more than under a Chapter 11 plan under which a higher or equally situated class receives a 2100% dividend. *See* 11 U.S.C. § 726(a). Thus, the Chapter 11 plan could not be confirmed over the objection of an affected creditor.

Further, if any one of Classes 5, 6, and 7 votes to reject the plan, § 1129(a)(8) will not be satisfied, and § 1129(b)(1) will be brought into play before the Court may confirm the plan. The latter provision prevents unfair discrimination between classes of unsecured claimants, especially where the disparity between the recovery percentages of those classes is large. *See, e.g., In re Aztec Co.,* 107 B.R. 585, 588–91 (Bankr.M.D.Tenn.1989). Paying one class of unsecured claimants a 2100% claim dividend [8] that either trumps or dilutes other unsecured creditors' claims is unfair discrimination where, outside of bankruptcy, the creditors would have an equal right to pursue and utilize judicial liens to collect from unencumbered assets based on 100% of the loan amount, court judgment, or other type of unsecured debt.[9] If what the debtor-in-possession needs to do is fund a risky venture by promising potentially lucrative returns, an issuance of securities in conjunction with Chapter 11 plan confirmation would potentially be the correct way to implement that goal. *See also*

*supra* note 7. However, under Chapter 11 plans, such security holders could not be administrative claimants and do not have superior legal rights to pre-petition creditors and post-petition administrative-expense claimants. *See* 11 U.S.C. §§ 101(10)(A), 501(a), 726(a), 1129(a)(4), (7), & (9).

Another significant obstacle to plan confirmation is section "XIII. Discharge," which provides as follows:

> Upon satisfaction of the allowed claims in this case, the Debtor, along with any and all co-debtors of the Debtor, shall be discharged of any and all obligations owed any such claimant, creditor, or other party in interest, providing any such claimant, creditor, or other party in interest votes affirmatively on the Plan, irrespective of whether any such claimant, creditor, or party in interest filed a proof of claim. Upon confirmation of the Debtor's Plan in this case, with said affirmative vote of those voting on the plan, any such claimant, creditor, or other party in interest shall be stayed from proceeding against any and all co-debtors of the Debtor, irrespective of whether any such claimant, creditor, or party in interest filed a proof of claim.

(IFPC Plan of Reorg. at 8.) This provision is difficult to reconcile with the Bankruptcy Code in a couple of respects and additionally creates an ambiguity with regard to those voting to reject the plan. The first sentence could be read to imply that the extremely broad discharge injunction will not issue with respect to rejecting

---

8. There is no question that as far as true administrative claims are concerned, 100% of the claim amount would have priority over the claims of general unsecured pre-petition creditors. *See* 11 U.S.C. §§ 503(b), 507(a)(1), 1129(a)(7)(A) & (a)(9)(A). Here, we are dealing with 2100% of the claim amount.

9. If, outside of bankruptcy, Class 4 would actually be considered to consist of shareholders under Illinois corporate law, then the right to such a dividend would, of course, come behind the creditors' claims of Classes 5, 6, and 7, and the payment scheme under this Chapter 11 plan would be even more unfairly discriminatory than just described.

creditors, while the second sentence appears to say that any creditor (whether rejecting or accepting the plan) is subject to an extremely broad injunction protecting unidentified *nondebtor* entities. The provision conflicts with § 524(e), which states that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Furthermore, federal courts have refused to enforce plan provisions creating super-discharge injunctions extending to nondebtor obligors, guarantors, insurers, or indemnitors for claims against the debtor. *See Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982) (construing 1898 Bankruptcy Act; subsequently limited by *Specialty Equipment, infra*); *Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir.1995); *In re Western Real Estate Fund*, 922 F.2d 592, 600–01 (10th Cir.1990); *In re Elsinore Shore Associates*, 91 B.R. 238, 250–51 (Bankr.D.N.J. 1988); *cf. Zerand–Bernal Group v. Cox*, 23 F.3d 159, 163 (7th Cir.1994) (dicta). When Congress desires to have a statutory injunction extend to nondebtors, it makes that intent clear. *See, e.g.*, 11 U.S.C. § 524(a)(3) (discharge injunction extended to community claims against debtor's spouse if community property is acquired post-petition) & § 1301 (automatic stay extended to certain co-debtors in Chapter 13 cases).

To be sure, the Seventh Circuit has distinguished third-party releases in Chapter 11 plans from the limitations on the discharge injunction in § 524(e), refusing to adopt a *per se* rule against the former. *See Matter of Specialty Equipment Companies*, 3 F.3d 1043, 1046–47 (7th Cir. 1993). Instead, in *Specialty Equipment*, it permitted "consensual and non-coercive" releases where the plan explicitly provided that each creditor who abstained or voted against the plan was "deemed not to have

granted the [r]eleases," even if the class to which such individual creditor belonged voted in favor of the plan. *Id.* at 1045, 1047. Other federal courts have gone so far as to allow confirmation of independent plan injunctions prohibiting nonconsenting creditors from collecting against nondebtors by utilizing other broad provisions of the Bankruptcy Code to effectively run around § 524(e): they either permit third-party releases as part of a settlement embodied in a plan under § 1123(b)(6) or issue an independent permanent injunction protecting third parties pursuant to § 105(a). These courts protect third parties from nonconsenting creditors, however, only after the bankruptcy court makes specific factual findings of "unusual circumstances," namely that the following seven criteria all exist:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full. . . .

*In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir.2002); *see also In re Master*

*Mortg. Inv. Fund,* 168 B.R. 930, 934–37 (Bankr.W.D.Mo.1994).[10]

Even under the unsettled, more permissive views of third-party Chapter 11 plan injunctions, the plan injunction here does not pass muster. The second sentence of section XIII is so broad as to enjoin all nonconsenting creditors from seeking outside monetary relief against "any and all co-debtors of the Debtor," who remain unidentified. Thus, the third-party injunction is nonconsensual as to AT & T, Hughes, and any other creditor voting against the plan. Further, under the *Dow Corning* and *Master Mortgage* criteria, the plan injunction against nondebtors could not be approved inasmuch as no disclosed information would permit a favorable finding on any of the first three required elements. *Cf. Matter of Woodbrook Associates,* 19 F.3d 312, 322 (7th Cir.1994). Moreover, Class 7, AT & T and Hughes, has already indicated that it will not vote as a class to accept the plan, thereby negating the required finding under element number four. Finally, the plan and the circumstances of this case combine to make impossible "an opportunity for those claimants who choose not to settle to recover in full," *Dow Corning,* 280 F.3d at 658, because Class 7 will have a claim only if it is the prevailing state court defendant holding an award of costs, in which case the primary asset of the estate will necessarily be worthless, and no assets from which the costs could otherwise be collected will likely exist.

The discharge of nondebtors is just the first of two infirmities in paragraph XIII of the plan. Regarding the other infirmity, the Bankruptcy Code provides as follows:

The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3); *see also Great American Pyramid,* 144 B.R. at 794 n. 10. Under § 727(a)(1), corporate Chapter 7 debtors never receive discharges.

IFPC's plan violates § 1141(d) of the Bankruptcy Code by granting the debtor-in-possession a discharge to which it is not entitled and, therefore, is facially unconfirmable. *See* 11 U.S.C. § 1129(a)(1)-(2). All that remains to be done, regardless of the Code chapter, is to prosecute a third trial (if and when the same is awarded and the necessary funds materialize) and then close shop and distribute the cash proceeds (if any) of the suit. Such an operation is a liquidation; it does not entail "engag[ing] in business after consummation of the plan." § 1141(d)(3). This determination is a federal statutory question; whether the activity is legal under Illinois corporate law is irrelevant.

On one last minor matter, the Court does not agree with AT & T that IFPC's plan violates the "absolute priority rule" by allowing all shareholders to retain their equity interests. The feasibility and likelihood of IFPC's future payment of AT & T's contingent debt has been rightly called in doubt, but such considerations are sepa-

---

**10.** "The Court cautions the Gentle Reader that a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors out-lined above are present will this Court even entertain the possibility of a permanent injunction." *In re Master Mortg. Inv. Fund,* 168 B.R. 930, 934–37 (Bankr.W.D.Mo.1994).

rate from § 1129(b)(2)(B)'s narrower requirement that a class of creditors be legally entitled to full payment in present-value terms if shareholders are to retain any property interests. According to the Chapter 11 plan in the case at bar, all classes of creditors are legally entitled to 100% payment of their allowed claims plus interest, thereby satisfying the "absolute priority rule." Nonetheless, this consideration does not remedy the various other defects that render IFPC's Chapter 11 plan unconfirmable.

IFPC did not defend against the U.S. Trustee's motion and AT & T Wireless's support thereof by offering any amendments to the filed Chapter 11 plan; the Court has no other plans to consider in this case. Also, "[a] Chapter 11 case can be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired.... The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless." *Matter of Woodbrook Associates,* 19 F.3d 312, 317, 320 n. 9 (7th Cir.1994); *see Citi-Toledo,* 170 B.R. at 606; *Great American Pyramid,* 144 B.R. at 792; 7 King et al., *supra,* ¶¶ 1112.04[4][c], at 1112–29.

### 3. Conclusion

As an alternative to its ruling under § 1112(b)(1), the Court finds that the U.S. Trustee has established grounds for dismissal or conversion under § 1112(b)(2), as the debtor-in-possession is unable to effectuate its Chapter 11 plan.

### C. Unenumerated Grounds Establishing "Cause" for Conversion or Dismissal, Including Lack of Good Faith in Filing a Chapter 11 Case

The U.S. Trustee argued in his reply brief and at the hearing on the motion that the circumstances of the present case demonstrate that the debtor has not met the good-faith filing requirement, because IFPC has no legitimate need for reorganization under Chapter 11, only a need to prevent itself from being sued for collection of prior litigation expenses.

While § 1112(b) permits involuntary dismissal or conversion for a nonexhaustive list of ten grounds, its general authority to dismiss "for cause" has engendered the development of common-law grounds for dismissal. Accordingly, federal courts have created a good-faith filing requirement for debtors opposing dismissal or conversion under § 1112(b). *See In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994); *In re Laguna Associates Ltd. Partnership,* 30 F.3d 734, 737–38 (6th Cir.1994); *In re Integrated Telecom Express,* 384 F.3d 108, 118 (3d Cir.2004); *In re International Oriental Rug Center,* 165 B.R. 436, 442 (Bankr.N.D.Ill.1994); *In re N.R. Guaranteed Retirement,* 112 B.R. 263, 270–71, 279 (Bankr.N.D.Ill.1990) (quoting *In re Madison Hotel Associates,* 749 F.2d 410, 426 (7th Cir.1984)); *In re Gleason,* 2002 WL 570647, at *1 (N.D.Ill.2002); *Quarles v. U.S. Trustee,* 194 B.R. 94, 96 (W.D.Va. 1996); *In re Citi–Toledo Partners,* 170 B.R. 602, 607 (Bankr.N.D.Ohio 1994); *Great American Pyramid,* 144 B.R. at 790; 7 King et al., *supra,* ¶ 1112.07[5]; *cf. Matter of Love,* 957 F.2d 1350, 1354 (7th Cir.1992) (same for Chapter 13 cases); *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1071–72 (5th Cir.1986). To make the requisite showing, the movant need not show, though it would be relevant, that the debtor had any sort of fraudulent or malicious intent or scheme in mind when filing; "malfeasance is not a prerequisite to bad faith." *In re Leavitt,* 209 B.R. 935, 940–41 (9th Cir. BAP 1997), *affirmed,* 171 F.3d 1219 (9th Cir.1999); *cf. Matter of Love,* 957 F.2d 1350, 1360–61 (7th Cir.1992) (same for Chapter 13 cases). Some courts have noted that focusing on terms such as good or bad faith in filing is

misleading to some degree, *see, e.g., In re Huckfeldt,* 39 F.3d 829, 832 (8th Cir.1994), as the question is really whether the debtor has presented a legitimate reorganizational objective within the scope of the Bankruptcy Code or rather has presented "tactical reasons unrelated to reorganization," *In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994); *see In re Integrated Telecom Express,* 384 F.3d 108, 119–20 (3rd Cir. 2004); *In re N.R. Guaranteed Retirement,* 112 B.R. 263, 271 (Bankr.N.D.Ill.1990); 7 King et al., *supra,* ¶ 1112.07[2], at 1112–65. Thus, the "good faith" doctrine of § 1112(b) is not concerned only with sanctioning the filer's subjective intent but also considers whether the Chapter 11 remedy is being utilized for the limited purposes intended. *See Integrated Telecom Express,* 384 F.3d at 122–29; *N.R. Guaranteed Retirement,* 112 B.R. at 271; 7 King et al., *supra,* ¶ 1112.07[2], at 1112–65 to – 67 (listing examples of illegitimate objectives). In fact, the good-faith filing requirement has been described as a term of art used to limit reorganizational filings to those cases that are within the legitimate objectives of a specialized statute. *See In re Liberate Technologies,* 314 B.R. 206, 211 (Bankr.N.D.Cal.2004).

■ Courts generally consider the totality of circumstances surrounding a variety of objective and subjective indicators. *See, e.g., In re Stump,* 280 B.R. 208, 214 n. 2 (Bankr.S.D.Ohio 2002); *see also In re Laguna Associates Ltd. Partnership,* 30 F.3d 734, 738 (6th Cir.1994); *Integrated Telecom Express,* 384 F.3d at 118; 7 King et al., *supra,* ¶¶ 1112.07[1]-[3] & [6][b][iii], at 1112–77 (noting the relevance of the fact that the debtor should have known that reorganization was impracticable). The inquiry often centers around the debtor's *bona fide* need for a breathing spell to reorganize, *see Liberate Technologies,* 314 B.R. at 211; *N.R. Guaranteed Retirement,*

112 B.R. at 272–73, and this need must be related to the dual purposes of " 'preserving going concerns' " and " 'maximizing property available to satisfy creditors,' " *Integrated Telecom Express,* 384 F.3d at 119–20, 128–29 (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)). The Fifth Circuit discussed a typical set of circumstances that exemplifies bad-faith filings:

> Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. . . . Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property . . . .
>
> Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's "terminal euphoria." The Sixth Circuit in *[In re] Winshall Settlor's Trust,* 758 F.2d [1136] at 1137 [(6th Cir. 1985)], aptly noted that [t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. *See In re Dolton Lodge Trust*

*No. 35188*, 22 B.R. 918, 922 (Bankr. N.D.Ill.1982). "[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre.* ..." *In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr.W.D.Ky.1983). *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072–1073 (5th Cir.1986). Other courts have described similar indicia of bad-faith filings as part of a list of factors, which include the following considerations:

(1) the debtor has only one asset;

(2) the debtor has an ongoing business to reorganize;

(3) there are any unsecured creditors;

(4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and

(5) the case is essentially a two party dispute capable of prompt adjudication in state court.

*In re St. Paul Self Storage Ltd. Partnership*, 185 B.R. 580, 582–83 (9th Cir. BAP 1995); *see also Laguna Associates*, 30 F.3d at 738. The Court has already discussed how factors one, two, and four weigh in favor of a finding against the debtor under § 1112(b)(1)-(2), and they have the same impact under the bad-faith inquiry. Factor five additionally weighs in favor of finding that this Chapter 11 was filed in bad faith, since this case is essentially a litigation maneuver to improve IFPC's chances of proceeding uninterrupted against contingent creditors AT & T and Hughes in the post-trial phases of the adjudicated trade-secret suit. Factor three is inconclusive on the present record. The *St. Paul Self Storage* court noted the "Debtor's lack of creditors, other than insiders and its own professionals," *St. Paul*, 185 B.R. at 583, a condition that may be present in the case at bar. Many of the creditors here are the debtor's "own professionals" retained to provide legal services, expert testimony, and other types of litigation-support services related to the state court action. The rest of the creditor body in this case appears to consist primarily of investors who may also be unsecured claimants. However, as discussed throughout this decision, the number of *bona fide* creditors (as opposed to equity security holders) is currently indeterminate and may in fact be much lower.[11] Finally, consistent with *Little Creek Development*, the Court notes the lack of employees other than principals in finding that the debtor filed this Chapter 11 case in bad faith, i.e., without any true need for imposing the Chapter 11 process on creditors.

■■■ While IFPC is correct that a debtor is eligible for Chapter 11 relief even though it does not maintain an ongoing business,[12] the Supreme Court's acknowl-

---

**11.** The inquiry is important as a result of the very different legal rights that creditors and equity security holders have under the Code. *See* 11 U.S.C. § 101(10), (16), & (17); § 726(a)(2) & (6); § 1129(a)(7)(A). While a bankruptcy trustee owes a fiduciary duty both to creditors and shareholders, the duty to creditors takes precedence over the duty to shareholders as a result of creditors' legally superior interests under federal bankruptcy law. *See Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985); *In re Weber*, 99 B.R. 1001, 1010 (Bankr.D.Utah 1989).

**12.** Whether an entity such as IFPC is a lawful corporation existing in good standing under the State of Illinois (as stressed by IFPC) is a separate legal question from whether its reorganizational objectives are entitled to continuing protection under Chapter 11. Whether pursuit of a cause of action is a legitimate activity in and of itself is beside the main point of the federal law embodied in § 1112.

edgment of this proposition in *Toibb v. Radloff*, 501 U.S. 157, 164, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991), pertained to the *initial* filing requirements under 11 U.S.C. § 109(b) and (d); it did not similarly narrowly construe the statutory limits to a debtor-in-possession's *ongoing* prerogative to utilize the provisions of Chapter 11, limits derived from the broad considerations embodied in § 1112(b) and distinct from § 109. *See id.* at 2201–02; *In re Trident Associates Ltd. Partnership*, 52 F.3d 127, 130–31 (6th Cir.1995) (distinguishing explicit language of § 109 from the much broader statutory language of § 362(d)(1) and § 1112(b)).

The Supreme Court also recognized that under various circumstances the "estate will be worth more if reorganized under Chapter 11 than if liquidated under Chapter 7." *Toibb*, 501 U.S. at 164, 111 S.Ct. at 2201. IFPC's contention that this condition is met in this case is based entirely on its assumption that its primary asset, the cause of action, will ultimately be meritorious and generate sufficient funds to pay all pre-petition and post-petition claims; it never factors into its analysis the substantial possibility that the creditor body as a whole will be worse off if it pursues a third trial and loses either in the Appellate Court of Illinois or in the Circuit Court of DuPage County. The debtor-in-possession's plan fails to take into consideration the very real possibility that it will not ultimately prevail at either level, leaving the estate with no assets and an even greater mountain of litigation debt than existed on the filing date.

IFPC is more optimistic about its prospect for "rehabilitation," maintaining that new investors have committed $250,000 to permit pursuit of the second appeal in state court. However, the "rehabilitation" label could be loosely attached to virtually any type of activity in a bankruptcy case, even though the absence of any true business activity would not warrant a traditional reorganization analysis of preserving going-concern value to benefit creditors and employees in the long run. *Cf. Integrated Telecom Express*, 384 F.3d at 120 (noting how one of two bankruptcy purposes, preservation of going-concern value, was not implicated where such value did not exist on the filing date anyway). It is true that a liquidation may require postpetition financing in certain situations such as the one at bar, where further funding is needed pursuant to § 364 for a trustee's attempt to realize the full potential value of an asset. The need for financing to maximize the value of the estate, though, does not equate with a need for "rehabilitation" or "reorganization" under Chapter 11. Here, a single intangible asset of speculative value may require re-liquidation, and no need for reorganization exists *per se.*

Liquidation under the present circumstances is nothing more than what would have occurred outside bankruptcy: litigating a cause of action through to judgment and, if any proceeds exist at the end of the day, distributing the proceeds according to nonbankruptcy law. As this Court recognized in the Chapter 7 context of *In re American Telecom Corp.*, 304 B.R. 867 (Bankr.N.D.Ill.2004) (Cox, J.), the claim will either fail on the merits, meaning that no creditor of the debtor/plaintiff receives any distribution, or the claim will produce a pot of money to satisfy the claims.[13] What is significant is the fact that this outcome will normally hold true regardless of whether the suit is conducted in the

---

13. During a later post-trial stage of the game, a Chapter 7 case or a nonbankruptcy workout/settlement could ration out the funds if the proceeds of the lawsuit were insufficient to satisfy the aggregate amount of claims.

context of a Chapter 11 case, of a Chapter 7 case, or of state-court litigation that is free from any pending bankruptcy case. The costly and complex provisions of Chapter 11 are neither beneficial nor necessary for accomplishing this task. *See generally Integrated Telecom Express*, 384 F.3d at 127; King et al., *supra*, ¶ 1112.04[4], at 1112–25 to –28. In other words, one of the valid purposes of a liquidating Chapter 11, maximizing a company's value for creditors, does not exist for a case in which the amount available for distribution does not hinge on the existence of the bankruptcy case. *See Integrated Telecom Express*, 384 F.3d at 126–29 & n. 4. Obtaining further investments to continue attempting to realize speculative value from the trade-secret claim is necessary both inside and outside of bankruptcy, and the bankruptcy framework does not likely make persuading new investors to join in any easier than the nonbankruptcy one. *Cf. Integrated Telecom Express*, 384 F.3d at 126 n. 7.[14]

Although its practical import is unclear, IFPC's best argument is that a few of the litigation-consultant creditors will sue, execute, and have a sheriff's sale of the primary asset to satisfy their debts, leaving the other creditors no assets from which to collect and no *pro rata* share of the asset that did exist (whatever it is worth). The Court acknowledges in this case-and has acknowledged the same in the Chapter 7 context, *see American Telecom*, 304 B.R. at 874 (Cox, J.)-that technically speaking, a creditor may use a "supplementary proceeding" under Illinois law to execute on a "chose in action" in satisfaction of a judgment, *see* 735 Ill. Comp. Stat. Ann. 5/2–1402(c)(5), although Illinois courts have discretion to deny turnover where prac-

tical and legal considerations counsel against such transfers, *see American Telecom*, 304 B.R. at 874. Nevertheless, as discussed *infra*, this type of bankruptcy law issue can be effectively addressed in a Chapter 7 case. In and of itself, it does not present any legitimate reason why a debtor-in-possession is entitled to proceed with a Chapter 11 case instead of a Chapter 7 case.

As an alternative to its rulings under § 1112(b)(1) and (b)(2), the Court finds that "cause" for conversion or dismissal has been established in that this Chapter 11 case was filed in bad faith, as an understanding of that term has developed under the Bankruptcy Code.

### D. Choosing Between Conversion and Dismissal of Chapter 11 Cases Under § 1112(b)

 Once "cause" is established under § 1112(b), the choice between dismissal and conversion to Chapter 7 is based on the best interests of creditors and of the estate. *See Quarles v. U.S. Trustee*, 194 B.R. 94, 97 (W.D.Va.1996); *Great American Pyramid*, 144 B.R. at 791–93. Where the estate is not generating revenue but value exists to be maximized for creditors' benefit, and where the creditor body will have more enhanced protection in the federal bankruptcy forum than in noncollective state-court proceedings, conversion to Chapter 7 rather than dismissal may be appropriate. *See Great American Pyramid*, 144 B.R. at 786–87; *In re Citi–Toledo Partners*, 170 B.R. 602, 609 (Bankr. N.D.Ohio 1994).

 The Court has considered conversion to Chapter 7 but has concluded that at the present time, a Chapter 7 case would not serve any substantial purpose. One of

---

**14.** "The fact that these insiders were willing to purchase the assets outside of bankruptcy undercuts any argument that the protections

of the Code affected the purchase price." *Integrated Telecom Express,* 384 F.3d at 126 n. 7.

two assets of the estate is a bank account that is a liquid asset with value realizable for the benefit of priority or nonpriority claimants. The amount of debt in this case is such that division of the $17,000 account fails to produce more than a *de minis* benefit. Investment data that AT & T has produced in an exhibit indicates that 10% of the original investments created debt, not equity. Thus, even a conservative estimate of 10% would produce $1,400,000 in loan debt in addition to the $750,000 in unpaid litigation expenses and legal fees, for a grand total of $2,150,000. *Pro rata* distribution of the $17,000 bank account in a Chapter 7 case would produce a dividend of less than 1%. *Cf. American Telecom*, 304 B.R. 867 (Bankr.N.D.Ill.2004) (Cox, J.) (dismissing Chapter 7 case because debtor corporation had no other significant assets to liquidate apart from the debtor's antitrust counterclaim previously adjudged in favor of the primary creditor/counterdefendant and pending on appeal).

As for the other asset, the trade-secret claim, it is technically property of the estate available for the benefit of creditors in a Chapter 7 forum, *see* 11 U.S.C. § 541, and the preexisting trial and appellate attorneys could be retained by the estate under § 327(e) for the limited, special purpose of prosecuting the claim in state court. Although the estate may abandon to the debtor burdensome assets of inconsequential value in the bankruptcy scenario, *see* 11 U.S.C. §§ 554(a)-(c) & § 362(c)(1); *Great American Pyramid*, 144 B.R. at 794, the claim does not completely evaporate as long as the debtor is willing to pursue the litigation independently. This far into the state court litigation there appears to be no advantage to adding a Chapter 7 trustee to the process and requiring him to evaluate the debtor's claim. To decide otherwise would have the Bankruptcy Court delay indefinitely the administration of a Chapter 7 case as the state court litigation of the debtor's only potential asset proceeds, perhaps for many years. (The litigation has proceeded for 11 years to date.) Instead, the debtor can independently proceed with the suit and thereby attempt to maximize the speculative value of its asset if it can obtain the necessary future investments.

Finally, one other problem identified above must be considered here: namely, that all creditors may be worse off if a few creditors begin suing and executing on the bank account and/or the trade-secret cause of action, leaving other creditors no possibility of recovery. At least right now, the Court is not aware that this dilemma exists, and it is unlikely to exist as most of those creditors are case professionals who have an interest in maintaining the status quo. Should this true bankruptcy concern come to pass, though, IFPC may still choose to file a voluntary Chapter 7 case in spite of the Court's dismissal of its Chapter 11 case; alternatively, affected creditors may initiate an involuntary Chapter 7 case to protect their interests. In these scenarios, even if the trustee abandons the cause of action, he could still be persuaded by concerned creditors to delay dismissing or closing the bankruptcy case until the state court litigation is finally resolved, thereby preserving the automatic stay to protect the creditor body from the acts of individual creditors who might sue IFPC to the detriment of all creditors. *See* 11 U.S.C. § 362(c)(2) & (a)(1)-(2) (defining the temporal scope of that portion of the automatic stay protecting the debtor personally rather than the estate property); *cf.* § 362(c)(1) & (a)(3)-(4) (temporal scope of the automatic stay protecting estate property). Similarly, if IFPC's primary asset ever produces any proceeds, but such proceeds are inadequate to pay all debts in full, a voluntary or involuntary Chapter 7

case could be filed *at that time* to fairly apportion the money in the event creditors cannot agree to a nonbankruptcy workout.

## Conclusion

For the foregoing reasons, the U.S. Trustee's motion to dismiss this Chapter 11 case is granted. This opinion constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052. A separate order consistent with the opinion will be entered in compliance with Bankruptcy Rule 9021.